05-4591-cr
United States v. Cavera

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2007

*(En Banc* Rehearing: March 27, 2008            Decided: December 4, 2008)

Docket No. 05-4591-cr

UNITED STATES,

*Appellee,*

v.

GERARD CAVERA, aka Gerry Lake, and PETER ABBADESSA,

*Defendants-Appellants.*

Before: JACOBS, *Chief Judge,* CARDAMONE,[*] CALABRESI, CABRANES, STRAUB,[†] POOLER, SACK, SOTOMAYOR, KATZMANN, PARKER, RAGGI, WESLEY, HALL, and LIVINGSTON, *Circuit Judges.*

Appeal from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Sifton, *J.*), sentencing Defendant-Appellant Cavera to an above-Guidelines sentence for the offense of conspiring to deal in and to transport firearms in violation

---

[*] Senior Circuit Judge Cardamone was a member of the initial three-judge panel that heard this appeal, and is therefore eligible to participate in *en banc* rehearing. 28 U.S.C. § 46(c)(1).

[†] Senior Circuit Judge Straub was an active member of the court when we heard the case, and is therefore eligible to participate in *en banc* rehearing. 28 U.S.C. § 46(c)(2).

of 18 U.S.C. § 371. A panel of this Court held that the district court erred in its reliance on specific characteristics of the locality where the firearms were transported to justify a higher sentence, and issued an opinion vacating the judgment and remanding the case for further proceedings. *United States v. Cavera*, 505 F.3d 216 (2d Cir. 2007).

After *en banc* rehearing, the panel opinion is vacated and the judgment of the district court is affirmed.

TARYN A. MERKL, Assistant United States Attorney (David C. James, Assistant United States Attorney, *of counsel*), *for* Benton J. Campbell, United States Attorney for the Eastern District of New York, Brooklyn, N.Y., *for Appellee.*

JEFFREY RABIN, Brooklyn, N.Y., *for Defendant-Appellant Gerard Cavera.*

Leonard Koerner & Deborah A. Brenner, *for* Michael A. Cardozo, Corporation Counsel of the City of New York, New York, N.Y., *for Amicus Curiae the City of New York*

CALABRESI, Circuit Judge, with whom Chief Judge JACOBS, and Judges CABRANES, SACK, KATZMANN, PARKER, RAGGI, WESLEY, HALL, AND LIVINGSTON join, and with whom Judges CARDAMONE, STRAUB, POOLER, and SOTOMAYOR join as to Parts I and II.A:

Defendant-Appellant Gerard Cavera appeals from a judgment entered on August 23, 2005 in the United States District Court for the Eastern District of New York.[1] Cavera pled guilty to a firearms trafficking offense. The district court imposed an above-Guidelines sentence after finding that the Sentencing Guidelines failed to take into account the need to punish more

---

[1] The judgment entered against Cavera's co-defendant, Abbadessa, was summarily affirmed by this Court on May 19, 2006.

-2-

severely those who illegally transport guns into areas like New York City. On appeal, Cavera contends, among other things, that the district court erred when it relied on local conditions to justify a higher sentence.

A panel of this Court held that the district court rested its decision on impermissible considerations, and determined that the sentence should be vacated and the case remanded for resentencing. *United States v. Cavera*, 505 F.3d 216 (2d Cir. 2007). We ordered rehearing *en banc*, and directed the parties to submit briefs on the effect of the Supreme Court's intervening decisions in *Gall v. United States*, 128 S. Ct. 586 (2007), and *Kimbrough v. United States*, 128 S. Ct. 558 (2007). With the benefit of the guidance afforded by those rulings, we now affirm the judgment of the district court.

## I.

Cavera, a septuagenarian army veteran with residences in New York and Florida, was arrested by the FBI with the aid of a confidential informant. Beginning in July 2003, the informant purchased guns illegally in New York City on several occasions from a man named Peter Abbadessa. Abbadessa told the confidential informant that his uncle, Anthony Lucania, had a friend named Gerry (Cavera), who acted as Abbadessa's Florida gun supplier. In April 2004, the confidential informant flew to Florida, along with Abbadessa and Lucania, for the express purpose of procuring firearms. At the FBI's direction, the informant paid Lucania $11,500 for sixteen guns. Abbadessa and Lucania then went to Cavera's residence in Deerfield Beach, Florida, where they gave Cavera money in exchange for two boxes containing sixteen firearms. The boxes were later given to the informant, who turned them over to the FBI. Abbadessa, Lucania, and the confidential informant returned to New York on separate flights.

On June 23, 2004, a grand jury returned an indictment charging Cavera, Abbadessa, and Lucania with various violations of the federal gun trafficking laws. Cavera pled guilty to one count of conspiracy to deal in and to transport firearms, in violation of 18 U.S.C. § 371.

Cavera first appeared for sentencing on June 9, 2005. At this point, Judge Sifton gave notice that he was considering an above-Guidelines sentence, "simply because I think the sentencing guidelines may understate the seriousness of this offense because of the consequences for the community of bringing or transporting . . . firearms into New York City." To guide the parties, Judge Sifton referred them to articles written by himself and by then-District Judge Raggi on local variation in federal sentencing. *See* Charles P. Sifton, *Theme and Variations: The Relationship Between National Sentencing Standards and Local Conditions*, 5 Fed. Sent'g Rep. 303 (1993); Reena Raggi, *Local Concerns, Local Insights: Further Reasons for More Flexibility in Guideline Sentencing*, 5 Fed. Sent'g Rep. 306 (1993). The district court adjourned the proceedings to give the parties an opportunity to address the issue.

The parties appeared again for sentencing on July 28, 2005. The court determined that the Guidelines recommended a sentence of twelve to eighteen months' imprisonment and a fine of $3,000 to $30,000. But Judge Sifton concluded that a higher sentence was appropriate, stating in open court that the Guidelines range did not adequately meet the "crying need to do what can be done to deter gun trafficking into the large metropolitan area[s] of this country." At the same time, the district court filed a detailed written opinion further explaining its reasoning. *United States v. Lucania*, 379 F. Supp. 2d 288 (E.D.N.Y. 2005).

In this opinion, Judge Sifton began by noting that the Guidelines, "[i]n the pursuit of national uniformity in sentencing practices," do not take local circumstances into account, and

instead reflect a national average. *Id.* at 293-94. For this reason, the Guidelines were "less persuasive" in Cavera's case than they would otherwise be. *Id.* at 296.

The district court explained its decision to impose an above-Guidelines sentence in terms of two of the § 3553(a) factors. Focusing first on the need for the sentence to reflect the seriousness of the offense, as directed by 18 U.S.C. § 3553(a)(2)(A), Judge Sifton found that Cavera's offense was more harmful than the national average offense contemplated by the Guidelines. "Firearms smuggled into New York City commonly end up in the hands of those who could not otherwise legally acquire them, are frequently used for illegitimate purposes, and have the potential to create a substantially greater degree of harm when in an urban environment . . . than in the United States generally." *Lucania,* 379 F. Supp. 2d at 295.[2] In this respect, the district court referred to statistical studies indicating that homicide rates were substantially higher in large urban areas than in suburban and rural locales. *Id.* Judge Sifton also noted that population density in the state of New York, in New York City, and especially in particular parts of the Eastern District of New York, exceeded the national average. *Id.* at 295 n.3.

The district court also relied on a greater-than-average need, in this case, to achieve strong deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). The purpose of gun trafficking laws "is to prevent lax firearm laws in one state from undermining the more restrictive laws of other states." *Lucania,* 379 F. Supp. 2d at 295. In states with strict gun laws, like New York, a higher percentage of guns used in crimes arrive from out of state than is the case in jurisdictions with less restrictive firearms laws. New York's strict gun control laws create a "larger black market" for guns than in places with less strict laws. *Id.* The district court cited an article describing New York City as "one of the 'unusual areas' to which running guns is a profitable enterprise."

[2] There was evidence suggesting that Cavera knew the guns were destined for New York.

*Id.* (citing Gary Kleck, *BATF Gun Trace Data and the Role of Organized Gun Trafficking in Supplying Guns to Criminals*, 18 St. Louis Univ. Pub. L. Rev. 23, 41 (1999)). Accordingly, Judge Sifton concluded that a more severe penalty for trafficking guns into New York City was necessary to bring about adequate deterrence. *Lucania*, 379 F. Supp. 2d at 295-96.

The district court noted next that a sentencing judge is also directed to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Judge Sifton recognized that his approach would lead to different sentences for otherwise-similar firearms traffickers in different federal districts. Such disparities, however, were not "unwarranted." *Lucania*, 379 F. Supp. 2d at 296. Rather, they were based on "objectively demonstrated, material differences between the impact of the offenses in those districts."[3] *Id.*

In one respect, Cavera benefited from Judge Sifton's willingness to disagree with the Guidelines. Judge Sifton noted that the Guidelines also failed to take into account "the inverse relationship between age and recidivism." *Id.* at 298. Judge Sifton stated that he would consider the lesser need for *specific* deterrence when sentencing Cavera, who was over seventy. *Id.* at 297-98.

On these bases, the court imposed a sentence of twenty-four months' imprisonment – six months longer than the top end of the applicable Guidelines range. Cavera was also sentenced to three years' supervised release, a $60,000 fine, and a $100 special assessment.

---

[3] When considering the issue of unwarranted disparities, the district court pointed out that "[a] conviction for similar conduct in a New York state court would likely earn [Cavera] a substantially more severe sentence than that called for by the Guidelines." *Lucania*, 379 F. Supp. 2d at 296.

Cavera appealed the sentence. Initially, the Government agreed with Cavera that the sentence could not stand.[4] Writing before *Gall* and *Kimbrough*, a panel of this Court held that Judge Sifton erred in his analysis of the § 3553(a) factors "by sentencing Cavera on the basis of a policy judgment concerning the gravity of firearms smuggling into a heavily populated area, like New York City, rather than on circumstances *particular* to the individual defendant and his crime." *Cavera*, 505 F.3d at 222 (citing *United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006)). For this reason, the panel determined that the sentence was procedurally and substantively unreasonable. *Id.* at 225. A majority of the Court's active judges voted to rehear the case *en banc. See* Fed. R. App. P. 35(a).

## II.

This Court employs the *en banc* procedure sparingly. But when we do hear a case en banc, and we are in substantial agreement, an *en banc* opinion gives us the opportunity to speak somewhat more broadly, for the purpose of giving guidance to district courts in this Circuit and to future panels of this Court, than we normally do as individual panels. *Cf.* Jon O. Newman, *In Banc Practice in the Second Circuit: The Virtues of Restraint*, 50 Brook. L. Rev. 365, 382 (1984) ("[A]n occasional in banc decision is useful to provide guidance in a frequently litigated area of the law . . . ."). Conversely, where our members possess significantly differing views on a particular issue, it is often wise to avoid speaking as an *en banc* Court unless the point is one that is strictly necessary to decide the case. *See* Jon O. Newman, *In Banc Practice in the Second*

---

[4] The government now contends that, in light of *Gall* and *Kimbrough*, the sentence is reasonable.

*Circuit, 1984-1988*, 55 Brook. L. Rev. 355, 369 (1989) ("[F]requent use of the in banc practice surely poses a threat to [collegiality]."). The case before us presents issues of both sorts.

A.

In *United States v. Booker*, the Supreme Court held that the mandatory application of the Sentencing Guidelines was incompatible with the Sixth Amendment. 543 U.S. 220, 226-27 (2005). Accordingly, the Court excised the portion of the Sentencing Reform Act of 1984 that ordinarily required district courts to impose Guidelines-range sentences. *See id.* at 245-46 (Remedial Op., Breyer, J.); *see also* 18 U.S.C. § 3553(b)(1). In Justice Breyer's "Remedial Opinion," the Court retained an important role for the Sentencing Commission, leaving untouched the statutory direction to district courts that they should consult the Guidelines range when imposing sentence. *See Booker*, 543 U.S. at 245-46 (Remedial Op., Breyer, J.); *see also* 18 U.S.C. § 3553(a). *Booker* rendered the Guidelines "effectively advisory," and permitted sentencing courts to tailor the appropriate punishment to each offense in light of other concerns. 543 U.S. at 245 (Remedial Op., Breyer, J.). After *Booker*, appellate courts were to review sentences for "unreasonableness." *Id.* at 261. (Remedial Op., Breyer, J.) (internal quotation marks and alteration omitted). Review for "unreasonableness" amounts to review for abuse of discretion. *See Gall*, 128 S. Ct. at 594 ("Our explanation of 'reasonableness' review in the *Booker* opinion made it pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions."); *Kimbrough*, 128 S. Ct. at 576 ("The ultimate question in Kimbrough's case is 'whether the sentence was reasonable—*i.e.*, whether the District Judge abused his discretion in determining that the § 3553(a) factors supported a sentence of [15 years] and justified a substantial deviation from the Guidelines range.'") (quoting

*Gall*, 128 S. Ct. at 600); *see also United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006) (stating that reasonableness review is "akin to review for abuse of discretion").[5]

The resulting regime is, at first glance, beguilingly simple. The district courts have discretion to select an appropriate sentence, and in doing so are statutorily bound to consider the factors listed in § 3553(a), including the advisory Guidelines range. The courts of appeals then review for abuse of discretion.

*Booker*, however, left unanswered a number of questions, both for sentencing judges and for those charged with the task of reviewing their work on appeal. Two of these are of particular relevance to this case. One question especially relevant to sentencing judges is to what extent may a district court, consistent with its statutory duty to consider the Guidelines, base its sentence on a policy disagreement with the Sentencing Commission? The second question, especially relevant to courts of appeals, is to what extent must appellate courts defer to the decisions of district courts? As Judge Henry Friendly presciently noted, abuse of discretion is not a uniform standard of review. Henry J. Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747, 756 (1982). Rather, where an appellate court reviews for abuse of discretion, "'the scope of review will be directly related to the reason why the category or type of decision is committed to the trial court's discretion in the first instance.'" *Id.* at 764 (quoting *United States v. Criden*, 648 F.2d 814, 817 (3d Cir. 1981)). "[D]efining the proper scope of review of trial court determinations requires considering in each situation the benefits of closer appellate scrutiny as compared to those of greater deference." *Id.* at 756. In the sentencing context, the

---

[5] The Supreme Court has suggested that the "unreasonableness" standard is a particularly deferential form of abuse-of-discretion review. *See Gall*, 128 S. Ct. at 591; *see also Concrete Pipe & Prods. of Cal. Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993).

-9-

question is further complicated by the presence of a third institution, the Sentencing Commission.

The Supreme Court recently offered further guidance. *See Gall v. United States*, 128 S. Ct. 586 (2007); *Kimbrough v. United States*, 128 S. Ct. 558 (2007); *Rita v. United States*, 127 S. Ct. 2456 (2007). In these cases, the Court expressed its view of the respective competencies of the Sentencing Commission, the district judges, and the courts of appeals. In some respects, the Supreme Court's recent decisions require us to modify our own practices. From those opinions, and from our own experience with the advisory Guidelines system, we derive the following principles.

A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. In addition to taking into account the Guidelines range, the district court must form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The sentencing judge is directed, moreover, to consider: a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation. *Id.* § 3553(a)(2). Additionally, district courts must take into account: the kinds of sentences available, *id.* § 3553(a)(3); any pertinent Sentencing Commission policy statement, *id.* § 3553(a)(5); the need to avoid unwarranted sentence disparities among similarly situated defendants, *id.* § 3553(a)(6); and, where applicable, the need to provide restitution to any victims of the offense, *id.* § 3553(a)(7).

Even after *Gall* and *Kimbrough*, sentencing judges, certainly, are not free to ignore the Guidelines, or to treat them merely as a "body of casual advice." *See United States v. Crosby*,

397 F.3d 103, 113 (2d Cir. 2005). A district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range. *Gall*, 128 S. Ct. at 596; *see also Crosby*, 397 F.3d at 112 (describing situations in which "precise calculation of the applicable Guidelines range may not be necessary"). The Guidelines provide the "starting point and the initial benchmark" for sentencing, *Gall*, 128 S. Ct. at 596, and district courts must "remain cognizant of them throughout the sentencing process," *id.* at 596 n.6. It is now, however, emphatically clear that the Guidelines are guidelines — that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable;[6] it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District judges are, as a result, generally free to impose sentences outside the recommended range. When they do so, however, they "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 597. In this way, the district court reaches an informed and individualized judgment in each case as to what is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing. 18 U.S.C. § 3553(a).

After *Gall* and *Kimbrough*, appellate courts play an important but clearly secondary role in the process of determining an appropriate sentence. We review the work of district courts under a "deferential abuse-of-discretion standard." *Gall*, 128 S. Ct. at 591. This form of appellate scrutiny encompasses two components: procedural review and substantive review.

---

[6] In this respect, the district court's reliance on the Guidelines differs from that of appellate courts which may, but need not, treat a Guidelines sentence as presumptively reasonable. *See Rita*, 127 S. Ct. at 2462; *see also Gall*, 128 S. Ct. at 595, 597.

As to substance, we will not substitute our own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case. *See United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006). We will instead set aside a district court's *substantive* determination only in exceptional cases where the trial court's decision "cannot be located within the range of permissible decisions." *United States v. Rigas*, 490 F.3d 208, 238 (2d Cir. 2007) (internal quotation marks omitted). To the extent that our prior cases may be read to imply a more searching form of substantive review, we today depart from that understanding. *See, e.g., United States v. Cutler*, 520 F.3d 136, 164, 167 (2d Cir. 2008).[7]

This degree of deference is only warranted, however, once we are satisfied that the district court complied with the Sentencing Reform Act's *procedural* requirements, and this requires that we be confident that the sentence resulted from the district court's considered judgment as to what was necessary to address the various, often conflicting, purposes of sentencing. *See In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008) ("Given the broad substantive discretion afforded to district courts in sentencing, there are concomitant procedural requirements they must follow.").

A district court commits procedural error where it fails to calculate the Guidelines range (unless omission of the calculation is justified, *see Crosby*, 397 F.3d at 112), makes a mistake in its Guidelines calculation, or treats the Guidelines as mandatory. *Gall*, 128 S. Ct. at 597. It also errs procedurally if it does not consider the § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact. *Id.* Moreover, a district court errs if it fails adequately to explain its chosen sentence, and must include "an explanation for any deviation from the Guidelines

---

[7] This does not mean that we are questioning the *result* reached in these cases. *See Cutler*, 520 F.3d at 176 (Pooler, J., concurring).

range."[8] *Id.* Where we find significant procedural error, one proper course would be to remand to the district court so that it can either explain what it was trying to do, or correct its mistake and exercise its discretion anew, *see, e.g., United States v. Williams*, 524 F.3d 209, 215-17 (2d Cir. 2008), rather than for the appellate court to proceed to review the sentence for substantive reasonableness. *See Gall*, 128 S. Ct. at 597 ("Assuming that the district court's sentencing decision is procedurally sound, the appellate court should *then* consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." (emphasis added)).

These broad statements, however, require more specificity, both as to substantive and procedural reasonableness review if they are to guide us in particular cases, including the one before us. Thus, when conducting substantive review, we take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts. *Rita*, 127 S. Ct. at 2466-67 ("In sentencing, as in other areas, district judges at times make mistakes that are substantive. . . . Circuit courts exist to correct such mistakes when they occur."). Unlike some of our sister circuit courts, we do not presume that a Guidelines-range sentence is reasonable. *Fernandez*, 443 F.3d at 27; *see Rita*, 127 S. Ct. at 2462 (permitting, but not requiring, the courts of appeals to adopt a presumption of reasonableness for within-Guidelines sentences); *see also Gall*, 128 S. Ct. at 597 ("If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness"). Nor can we presume that a non-Guidelines sentence is unreasonable, or require "extraordinary" circumstances to justify a deviation from the Guidelines range. *Gall*, 128 S. Ct. at 595. Where, as in the case before us, we review a non-

---

[8] For more discussion of what this requirement entails, and what it does not, see *infra* page 18.

-13-

Guidelines sentence, we may "take the degree of variance into account and consider the extent of a deviation from the Guidelines." *Id.* But we must not employ a "rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.*

In reviewing sentences for reasonableness, we are, of course, bound by 18 U.S.C. § 3661. (stating that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). Thus, at the procedural part of review, we will not categorically proscribe any factor "concerning the background, character, and conduct" of the defendant, with the exception of invidious factors. *See, e.g., United States v. Kaba*, 480 F.3d 152, 156-57 (2d Cir. 2007); *see also United States v. Watts*, 519 U.S. 148, 152 (1997) (citing § 3661 in concluding that reviewing courts cannot "invent a blanket prohibition against considering certain types of evidence at sentencing"); *United States v. Concepcion*, 983 F.2d 369, 387 (2d Cir. 1992) (recognizing sentencing court's authority to "take into account any information known to it"). But this does not grant district courts "a blank check to impose whatever sentences suit their fancy." *United States v. Jones*, 531 F.3d 163, 174 (2d Cir. 2008). At the substantive stage of reasonableness review, an appellate court may consider whether a factor relied on by a sentencing court can bear the weight assigned to it. To be sure, this review is deferential. *See Gall*, 128 S. Ct. at 597 (holding that appellate court "must give due deference" to the district court's determination as to the "extent" of variance warranted by a given factor). As a result, we do not consider what weight we would ourselves have given a particular factor. *Id.* Rather, we consider whether the factor, as explained by the district court, can bear the weight assigned it under the totality of circumstances

in the case. Such an approach is consistent with and follows from the Supreme Court's emphasis on "individualized" sentencing, *id*, because it allows district courts to explain why factors that might not be relevant in most cases are relevant in the case at issue. At the same time, it ensures that appellate review, while deferential, is still sufficient to identify those sentences that cannot be located within the range of permissible decisions.

Accordingly, we will continue to patrol the boundaries of reasonableness, while heeding the Supreme Court's renewed message that responsibility for sentencing is placed largely in the precincts of the district courts. In at least one respect, *Gall* and *Kimbrough* manifestly require us to give more latitude to sentencing judges than this Court did before. After the Supreme Court's decision in *Booker* but before its decisions in *Kimbrough* and *Gall*, we suggested that it was not permissible for a district court to rest its decision on a policy judgment applicable to an entire category of offenses. *See, e.g., Cavera*, 505 F.3d at 223; *United States v. Trupin*, 475 F.3d 71, 76 (2d Cir. 2007), *vacated,* 128 S.Ct. 862 (2008); *United States v. Park*, 461 F.3d 245, 249 (2d Cir. 2006); *United States v. Castillo*, 460 F.3d 337, 361 (2d Cir. 2006), *abrogated by Kimbrough*, 128 S. Ct. 558; *cf. United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007); *United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006). That, we now know, is not the case. As the Supreme Court strongly suggested in *Kimbrough*, a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses. *See Kimbrough*, 128 S. Ct. at 574-75; *see also United States v. Regalado*, 518 F.3d 143, 147 (2d Cir. 2008).

When, moreover, we examine a district court's justification for differing from the Guidelines recommendation, our review must be informed by the "discrete institutional

strengths" of the Sentencing Commission and the district courts. *Kimbrough*, 128 S. Ct. at 574.[9] As a result, a district court's decision to vary from the Guidelines "may attract greatest respect when the sentencing judge finds a particular case outside the 'heartland' to which the Commission intends individual Guidelines to apply." *Id.* at 574-75 (internal quotation marks omitted). Where, instead, the sentencing judge varies from the Guidelines "based solely on the judge's view that the Guidelines range fails properly to reflect § 3553(a) considerations even in a mine-run case," the Supreme Court has suggested that "closer review may be in order." *Id.* at 575 (internal quotation marks omitted). Nevertheless, in *Kimbrough* itself, the Supreme Court found that no "closer review" was warranted where a district court based its sentence on a policy disagreement with the 100-to-1 crack cocaine vs. powder cocaine weight ratio, because the crack cocaine Guidelines are not based on empirical data and national experience, and hence "do not exemplify the Commission's exercise of its characteristic institutional role." *Id.*

We do not, however, take the Supreme Court's comments concerning the scope and nature of "closer review" to be the last word on these questions. More will have to be fleshed out as issues present themselves. For instance, we note that some Guidelines enhancements and reductions apply without modulation to a wide range of conduct. The Armed Career Criminal Guidelines, to take one example, sharply increase the recommended sentences for firearms offenses where the defendant has a prior conviction for a "crime of violence." U.S.S.G. § 2K2.1(a). The Guidelines' definition of the term "crime of violence," however, includes a wide

---

[9] Thus *Kimbrough* distinguishes between cases where a district court disagrees with Guidelines that were formulated based on special expertise, study, and national experience and those that were not and therefore "do not exemplify the Commission's exercise of its characteristic institutional role." *See Kimbrough*, 128 S. Ct. at 575.

spectrum of offenses of varying levels of seriousness, from, on the one hand, murder or rape, to, on the other hand, attempted burglary of a dwelling. *Id.* § 4B1.2(a)(2). Similarly, many Guidelines such as those covering "offenses involving taxation," U.S.S.G. § 2T4.1, "antitrust offenses," *see id.* § 2R1.1, and larceny, embezzlement, fraud, and similar crimes, *see id.* § 2B1.1, drastically vary as to the recommended sentence based simply on the amount of money involved.[10] Here again a district court may find that even after giving weight to the large or small financial impact, there is a wide variety of culpability amongst defendants and, as a result, impose different sentences based on the factors identified in § 3553(a). *Cf. United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) (concluding that the sentencing disparity between co-defendants in a securities fraud case was reasonable in light of the "varying degrees of culpability and cooperation between the various defendants"). Such district court decisions, if adequately explained, should be reviewed especially deferentially.

But what does the procedural requirement, that the district court must explain its reasons for its chosen sentence, entail? The statutory scheme has long required sentencing judges, "at the time of sentencing," to state their reasons for imposing the particular sentence "in open court." 18 U.S.C. § 3553(c). And where a non-Guidelines sentence is selected, the district court must also explain its reasons for doing so "with specificity in the written order of judgment and commitment." *Id.* § 3553(c)(2). Now that the Guidelines are advisory, and the sentencing decision is discretionary, the need for explanation has itself been modified.

---

[10] For tax offenses, the measure is the amount of "tax loss." U.S.S.G. § 2T4.1. For antitrust offenses, the measure is "volume of commerce attributable to the defendant." *Id.* § 2R1.1(b)(2). For theft, embezzlement, and similar crimes, it is the amount of loss. *Id.* § 2B1.1(b)(1).

Requiring judges to articulate their reasons serves several goals. Most obviously, the requirement helps to ensure that district courts actually consider the statutory factors and reach reasoned decisions. The reason-giving requirement, in addition, helps to promote the perception of fair sentencing. *See Rita*, 127 S. Ct. at 2468 ("Confidence in a judge's use of reason underlies the public's trust in the judicial institution. A public statement of those reasons helps provide the public with the assurance that creates that trust."). Furthermore, the practice of providing reasons "helps [the sentencing process] evolve" by informing the ongoing work of the Sentencing Commission. *Id.* at 2469. Finally, for our own purposes, an adequate explanation is a precondition for "meaningful appellate review." *Gall*, 128 S. Ct. at 597. We cannot uphold a discretionary decision unless we have confidence that the district court exercised its discretion and did so on the basis of reasons that survive our limited review. Without a sufficient explanation of how the court below reached the result it did, appellate review of the reasonableness of that judgment may well be impossible.

As a result, in its explanation the district court must satisfy us that it has "considered the parties' arguments" and that it has a "reasoned basis for exercising [its] own legal decisionmaking authority." *Rita*, 127 S. Ct. at 2468. But, what is adequate to fulfill these purposes necessarily depends on the circumstances. As we have often said, we do not require "robotic incantations" that the district court has considered each of the § 3553(a) factors. *Crosby*, 397 F.3d at 113 (quotation marks omitted); *see also Fernandez,* 443 F.3d at 30 (noting that "we presume, in the absence of record evidence suggesting otherwise, that a sentencing judge has faithfully discharged her duty to consider the statutory factors"). Sentencing is a responsibility heavy enough without our adding formulaic or ritualized burdens. And, a brief statement of reasons will generally suffice where the parties have addressed only

"straightforward, conceptually simple arguments" to the sentencing judge. *Rita*, 128 S. Ct. at 2468. A district judge imposing a non-Guidelines sentence, however, should say why she is doing so, bearing in mind, once again, that "a major departure [from the Guidelines] should be supported by a more significant justification than a minor one," *Gall*, 128 S. Ct. at 597, and that varying from the Guidelines in a "mine-run" case may invite closer appellate review, especially when the Guidelines at issue are a product of traditional empirical and experiential study, *Kimbrough*, 128 S. Ct. at 575.

When all is said and done though, once we are sure that the sentence resulted from the reasoned exercise of discretion, we must defer heavily to the expertise of district judges. This circumspect form of review, it is true, may result in substantial variation among district courts. But "some departures from uniformity [are] a necessary cost" of the *Booker* remedy. *Id.* at 574. And in its recent cases, the Supreme Court has made clear its view that disparities in sentences imposed by different district judges are more likely to reflect justified differences than are those arising from differences of opinion among appellate panels. This last point may not be easy for appellate panels to accept, but we believe that it is what the Supreme Court has instructed.

In this respect, we emphasize that sentencing discretion is like an elevator in that it must run in both directions. Under *Gall*, *Kimbrough*, and *Irizarry v. United States*, 128 S. Ct. 2198 (2008), district courts have the power to impose sentences both above and below the Guidelines range. *See Irizarry*, 128 S. Ct. at 2204 (upholding a district court's imposition of an above-Guideline sentence); *Gall*, 128 S. Ct. at 600-02 (upholding a district court's decision to impose a non-custodial sentence where the Guidelines recommended at least thirty months in prison); *Kimbrough*, 128 S. Ct. at 576 (upholding a district court's decision to impose a sentence four-

and-a-half years lower than the bottom end of the Guidelines range, where the district court found that the crack cocaine Guidelines overstated the need to punish the defendant).

B.

How do these considerations apply in the case before us? We begin by asking whether the court below committed any "significant procedural error." *Gall*, 128 S. Ct. at 597. We find no error in the district court's calculation of the Guidelines range.[11] Judge Sifton, moreover, clearly considered the Guidelines, and certainly did not treat that range as mandatory nor presume that it was reasonable.

Cavera contends that the district court erred procedurally by failing to give him an adequate advance explanation of the court's intent to impose an above-Guidelines sentence. Under Federal Rules of Criminal Procedure 32(h) and 32(i)(1)(C), it appears that a district court must provide a defendant with notice of its intent to impose a non-Guidelines sentence and an opportunity to challenge the grounds for such a sentence. The Supreme Court recently held, however, that any "expectation subject to due process protection . . . that a criminal defendant would receive a sentence within the presumptively applicable guideline range did not survive . . . *United States v. Booker*." *Irizarry*, 128 S. Ct. at 2202. Consequently, this requirement of reasonable notice no longer applies to sentences at variance with the Guidelines' recommended range. Nonetheless, "[s]ound practice dictates that judges in all cases should make sure that the information provided to the parties in advance of the hearing, and in the hearing itself, has given

---

[11] The district court denied Cavera's motion for a downward departure based on his wife's health. We adopt the panel's decision to affirm the district court in this respect. *See Cavera*, 505 F.3d at 226.

-20-

them an adequate opportunity to confront and debate the relevant issues." *Id.* at 2203. We conclude that Judge Sifton followed this sound practice. He did so by informing the parties that he was considering an above-Guidelines sentence because the crime involved trafficking guns to New York City, by referring the parties to relevant articles on the subject, and by adjourning the proceedings so that the parties could prepare submissions and make arguments on the question of whether local variation was justified.

Whether or not the district court's decision in this case reflected a categorical policy disagreement with the Guidelines,[12] the Supreme Court's recent teachings strongly suggest that such a disagreement does not suffice to render that decision either procedurally or substantively unreasonable. It is now clear that, in appropriate circumstances, district courts may rely on categorical factors to increase or decrease sentences. There is, in addition, no special reason to think that reliance on a locality-based categorical factor is—without more—suspect. The environment in which a crime was perpetrated may, in principle, inform a district court's judgment as to the appropriate punishment in any number of ways. We agree with Judge Sifton that, while a district court should not rely on "subjective considerations such as 'local mores' or feelings about a particular type of crime," a finding "that the crime will have a greater or lesser impact given the locality of its commission is appropriately considered in crafting a reasonable sentence post-*Booker*." *Lucania*, 379 F. Supp. 2d at 296. As always, the more specifically in the purposes of sentencing a district court's rationale is grounded, the more likely it is to survive

---

[12] As the district court noted, the Commission has never specifically addressed the issue of how geography or demographics might be factored into an assessment of the severity of particular crimes, though Congress invited it to do so. *See Lucania*, 379 F. Supp. 2d at 294 (citing S. Rep. 98-225 at 170).

appellate inspection. *Cf. United States v. Politano*, 522 F.3d 69, 72 (1st Cir. 2008) (affirming an above-Guidelines sentence for a gun trafficking offense where the district court made a specific finding that there was an "'epidemic of handgun violence in communities within [the District of Massachusetts]'").

Judge Sifton stated expressly that he did not base his decision on "local feelings" in New York that gun trafficking is more serious. *Lucania*, 379 F. Supp. 2d at 294. The district court can properly be read to have rested its decision that a sentence above the Guidelines range was necessary to satisfy the § 3553(a)(2) factors on two independent grounds. The first ground was the nonspecific geographical and demographic fact that New York City is a large metropolitan area. In this respect, Judge Sifton observed that urban areas have higher homicide rates than suburban and rural areas; that in those parts of New York City included in the Eastern District of New York, population density sometimes exceeded 35,000 persons per square mile when the national average was only 78 persons per square mile; and that guns smuggled into New York City frequently end up in the hands of persons not legally authorized to possess them and are used for illegitimate purposes. *Id.* at 295. From these circumstances, he concluded that firearm trafficking into New York City, and specifically into those boroughs in the Eastern District of New York, presented a greater risk of harm. The district court's second ground focused instead on New York's stricter gun regulatory scheme. More stringent local regulation in New York, the district court found, "renders gun running a more serious problem and creates a larger [and more profitable] black market" than in other places. *Id.* Accordingly, on the district court's view, "a more severe penalty is necessary to produce adequate deterrence." *Id.*

As to the district court's first ground, our Court is divided. Were it necessary to reach the issue, some of us would hold that the district court, in its wide discretion, permissibly relied on a

determination that trafficking guns into an urban area is likely to create more harm than the national average offense envisaged by the Guidelines. Others would hold that the district court erred to the extent that it based the sentence on the notion that guns are more dangerous in metropolitan areas. Still others are unsure whether reference to such broad, nonspecific geographical and demographic factors is appropriate in the context of this case.

We need not resolve that disagreement today, because the district court's second ground, that of deterrence, provides an independently sufficient justification for its variation from the Guidelines.[13] The court clearly concluded that the existence and enforcement of strict local gun laws in a particular jurisdiction is likely to make the cost of getting a gun in that jurisdiction higher than in a jurisdiction with lax anti-gun laws. This, the court indicated, will increase the profits to be had from trafficking guns into the strong-enforcement jurisdiction. There is considerable support for this opinion. *See* Philip J. Cook et al., *Guns and Violence Symposium:*

---

[13] Similarly, we need express no opinion on the district court's consideration, in the course of its § 3553(a) analysis, of the fact that Cavera would have received a stiffer sentence had he been convicted of the analogous New York State offense. *Cf.* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *Williams*, 524 F.3d at 215 ("The displacement of the Sentencing Guidelines at the threshold, because of a 'personal policy' to conform the sentence to one that would have been imposed in a proceeding in [state court], cannot be reconciled with 18 U.S.C. § 3553(a), which provides that '[t]he court, in determining the particular sentence to be imposed shall consider' the Sentencing Guidelines. 18 U.S.C. § 3553(a)(4).").

*Regulating Gun Markets*, 86 J. Crim. L. & Criminology 59, 72 (1995) ("In cities such as New York and Boston, where the prevalence of gun ownership is low because legal transactions are subject to onerous regulations or are banned, prices in the secondary market are higher than in other east coast locales. . . . As a result, dealers have long been able to make a profit by buying guns in Virginia or points south and running them northward to the street markets of northeastern cities."); Gary Kleck, *BATF Gun Trace Data and the Role of Organized Gun Trafficking in Supplying Guns to Criminals*, 18 St. Louis U. Pub. L. Rev. 23, 28-29 (1999) (explaining that in cities subject to "unusually strict gun laws . . . opportunities for gun traffickers to profit should be at their maximum").[14] Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence. *See* Richard A. Posner, Economic Analysis of the Law, § 7.2 (3d ed. 1986) ("A person commits a crime because the expected benefits of the crime to him exceed the expected costs.").

Like any economic theory, these points are not uncontroversial, but it is not an abuse of discretion for courts to rely on this form of reasoning in deciding on an appropriate sentence.

---

[14] There are at least two interrelated reasons why gun running may well be more profitable in areas with stringent gun laws. One is that different prices in different places create an arbitrage opportunity whereby criminals can buy guns at a lower price in state A and sell them at a higher price in state B. The other is that stringent local gun regulations create a higher barrier to entry in the gun market. In perfectly competitive markets, expected profits are generally low because as profitability increases, new businesses enter the market and thus increase supply, driving down prices and effectively reducing the profit. Where, however, local laws create a higher-than-usual barrier to entry, there are fewer "businesses" willing to enter the illegal market and thus more profit to be made by those willing to break the law.

Indeed, the statutory requirement that sentencing courts consider, on a case by case basis, what is necessary for "deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), almost inevitably makes judges focus on notions and theories that may be controversial to some.[15]

Of course, Cavera was selling guns in Florida, not in New York. The evidence, however, supported an inference that Cavera knew the guns he sold were destined for New York. Although he was not himself the exporter to New York, he was a knowing participant in the traffic heading in that direction. As a result, there was no abuse of discretion in the court's decision to consider New York market conditions in order to accomplish the goal of general deterrence.

In the course of an unusually detailed explanation of his reasoning, Judge Sifton discussed the relevant § 3553(a) considerations, and explained with particularity his basis for disagreeing with the Guidelines recommendation in the specific context of Cavera's case. Judge Sifton, moreover, reached an individualized judgment as to what the purposes of sentencing required in this case. In view of Cavera's advanced age, the district court chose to reduce the sentence it would otherwise have imposed based on its perception that Cavera was less likely

---

[15] We do not mean to say that the use of academic theories is beyond the purview of appellate court review. There are at any given time theories that are sufficiently clearly junk science so that reliance on them makes a decision by the district court unreasonable, outside of "the range of permissible decisions," *Rigas*, 490 F.3d at 238. In a different but not completely dissimilar context, however, the Supreme Court has instructed that district courts should be the primary gate-keepers of junk science subject always to review that is deferential. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

than the average offender to reoffend. In addition, Judge Sifton explicitly considered the need to avoid unwarranted sentence disparities, and concluded that sentencing disparities among different federal districts were warranted by, among other things, the greater need for deterrence in New York, with its more profitable black market in firearms. Given the deference we owe to district judges, especially after *Gall* and *Kimbrough*, this deterrence-based rationale easily suffices to justify the sentence. It follows that it would not be an abuse of discretion to impose a prison sentence of twenty-four months that exceeded the top end of the Guideline range by just six months, and a fine that surpassed the Guidelines maximum by $30,000. In relation to both the recommended Guidelines sentence and the §3553(a) factors, the sentence is substantively reasonable.

What then of the broad demographic and geographic factors the district court considered? It seems clear to us from the record that the district court would have imposed the same sentence had it relied solely on the New York-specific rationale that the local gun regulatory scheme created a heightened need for deterrence in this case. In these circumstances, we need not decide whether the district court erred when it also relied, in the alternative, on the wider notions of geographic and demographic variation because, even if we were to identify error, it would be harmless in the light of the alternative independent ground for the challenged sentence. Since any such error would be harmless, the sentence imposed in this case withstands appellate review.

## III.

The panel decision is **VACATED**, and the judgment of the district court is **AFFIRMED**.

-26-

KATZMANN, *Circuit Judge,* with whom CABRANES, SACK, and HALL, *Circuit Judges,* join, *concurring*:

I concur in Judge Calabresi's thoughtful and comprehensive assessment of the landscape following the Supreme Court's decisions in *Gall* and *Kimbrough*. In particular, I agree that the Supreme Court limited the Courts of Appeals' role in reviewing sentences, whether they vary above or below the applicable Guidelines range, so long as a district court's rationale for a sentence is discernible and reasonable. I also agree with Judge Calabresi that, despite *Gall* and *Kimbrough*, we still have a role to play in "patrol[ling] the outer boundaries of reasonableness." Fixing those boundaries is ultimately an exercise of judgment, one that cannot be reduced to a simple formula or applied mechanically.

Undoubtedly, this and other Courts of Appeals will someday vacate sentences on the ground that a district court's reasoning is so unpersuasive as to render it unreasonable. As I read the Supreme Court's decisions, this is not such a case. I write separately to note simply that an appellate court need not, in the end, find a district court's reasoning compelling in order to affirm. Were we charged with adjudicating a policy debate, the dissenters might well prevail. But I do not think that is a task the Supreme Court would have us undertake. Rather, I understand the Supreme Court to mean we must defer to the district court's assessment so long as it is "reasonable." Courts will have to determine in individual cases the line at which reasonableness ends and arbitrariness begins, with the twin hobgoblins of widely variant sentences and overbearing circuit-court review lurking in the shadows. Ultimately, however, in light of the Supreme Court's directives, I do not think that this is a case in which the district court has crossed that line.

Accordingly, I concur.

REENA RAGGI, Circuit Judge, with whom Chief Judge JACOBS, Judge CABRANES, and Judge PARKER join, concurring:

Our court, sitting en banc, today identifies a set of fundamental principles regarding the imposition and review of federal sentences after the Supreme Court's decisions in Gall v. United States, 128 S. Ct. 586 (2007), and Kimbrough v. United States, 128 S. Ct. 558 (2007). I join in the opinion of the court unanimously endorsing those principles. See ante Parts I & II.A. I also join a majority of the court in holding that a 24-month sentence for illegally trafficking 16 guns to New York City is reasonable in this case and, therefore, affirming the judgment of the district court. See ante at Part II.B. I write separately simply to clarify that my rationale for affirming is not limited to the majority's approval of the district court's assessment of the need for adequate deterrence of gun trafficking into New York City. See 18 U.S.C. § 3553(a)(2)(A). Consistent with the principles announced by the court today, I conclude that the district court also acted well within its discretion in finding that local circumstances rendered Cavera's gun trafficking more serious than the mine-run case reflected in the Sentencing Guidelines' recommended 12-18 month prison range.[1] See

---

[1] In concluding that Cavera's gun smuggling was particularly serious because he knew that the guns sold would be transported into New York City, particularly that part of the city included in the Eastern District of New York, Judge Sifton made the following findings of fact:

(a) "Firearms smuggled into New York City commonly end up in the hands of those who could not otherwise legally acquire them." United States v. Lucania, 379 F. Supp. 2d 288, 295 (E.D.N.Y. 2005).

(b) Such guns "are frequently used for illegitimate purposes." Id.

1

id. Because the majority opinion does not address this part of the district court's analysis, and because dissenting colleagues identify error therein, I here explain my reasons for concluding otherwise.[2]

1.    The Presumptions Proscribed and Review Standard Mandated by *Gall* and *Kimbrough*

In reviewing the reasonableness of the challenged sentence, two rulings in Gall v. United States, 128 S. Ct. 586, are particularly instructive. First, while a district court is statutorily obliged to consider the Guidelines in imposing sentence, see 18 U.S.C. § 3553(a)(4), it commits constitutional error if it presumes the reasonableness of a Guidelines sentence and fails to determine for itself the sentence warranted by the totality of factors stated in 18 U.S.C. § 3553. See Gall v. United States, 128 S. Ct. at 596-97; ante at [11]. Second, a reviewing court is constitutionally prohibited from applying "a presumption of unreasonableness" to a non-Guidelines sentence. Id. at 597; ante at [13]. These twin rulings caution that, whatever concerns reviewing courts may have about affording district courts

(c)    Such use has "the potential to create a substantially greater degree of harm when in an urban environment such as New York City than in the United States generally." Id.; see also id. at 295 n.3 (citing statistical evidence showing, inter alia, that New York City is "the most densely populated urban area of the country," and that, "while the population density of the United States on average is . . . about 78 people per square mile," the "population density of parts of the Eastern District of New York exceeds 35,000 per square mile").

[2] To the extent dissenting colleagues also fault the district court's reliance on local facts to support its deterrence assessment, I have nothing to add to the majority opinion's explanation for why our court identifies no error in this respect.

leeway to impose non-Guidelines sentences, particularly based on general rather than case-specific concerns, we cannot, consistent with the Sixth Amendment, pronounce rules or impose burdens that effectively place a "thumb on the scales" in favor of Guidelines sentences. See Kimbrough v. United States, 128 S. Ct. at 577 (Scalia, J., concurring).

Specifically, we cannot demand "'extraordinary' circumstances to justify a sentence outside the Guidelines range." Gall v. United States, 128 S. Ct. at 595; ante at [13-14]. We cannot use "the percentage of a departure [from the Guidelines] as the standard for determining the strength of the justifications required for a specific sentence." Gall v. United States, 128 S. Ct. at 595; see ante at [14]. We cannot prohibit non-Guidelines sentences based on a sentencing judge's disagreement with Commission policy determinations. See Kimbrough v. United States, 128 S. Ct. at 570; Rita v. United States, 127 S. Ct. 2456, 2465 (2007) (observing that district courts may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations"); ante at [15]. Finally, although we may (1) reasonably expect a "major departure [to] be supported by a more significant justification than a minor one," Gall v. United States, 128 S. Ct. at 597, and (2) conduct "closer review" of a justification "when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range fails properly to reflect § 3553(a) considerations even in a mine-run case," Kimbrough v. United States, 128 S. Ct. at 575 (internal quotation marks omitted), the standard of review remains the same in every case. As Gall makes clear, "the abuse-of-discretion standard of review applies to appellate review

3

of all sentencing decisions – whether inside or outside the Guidelines range." 128 S. Ct. at 596 (emphasis added).[3]

## 2. The Procedural and Substantive Components of Reasonableness Review

Gall confirms that reasonableness review has both a procedural and substantive component. At the procedural stage, Gall provides five examples of potential errors by a sentencing court: (1) "failing to calculate (or improperly calculating) the Guidelines range,"[4] (2) "treating the Guidelines as mandatory," (3) "failing to consider the § 3553(a) factors," (4) "selecting a sentence based on clearly erroneous facts," or (5) "failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range." Id. at 597; ante at [12-13].

If "no significant procedural error" is identified, a reviewing court then "consider[s] the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard," taking "into account the totality of the circumstances, including the extent of any variance from the Guidelines range." Gall v. United States, 128 S. Ct. at 597; ante at [12, 14-15]. Gall emphasizes that substantive review is narrow: "it is not for the Court of Appeals to decide de novo whether the justification for a variance is sufficient or the sentence

---

[3] As the court observes, "reasonableness" appears to be a particularly deferential form of abuse-of-discretion review. See ante [9 n.5].

[4] We reaffirm today that omission of a Guidelines calculation can be justified in certain circumstances. See ante at [12] (citing United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005)). Where such justification is not present, however, Gall makes clear that failure to calculate the applicable Guidelines range is a procedural error.

reasonable." 128 S. Ct. at 602. Rather, reviewing courts "must give due deference to the district court's decision that the § 3553 (a) factors, on the whole, justify the extent of the variance." Id. at 598; see id. 602 (same); ante at **[14]**. Thus, for a sentence to be substantively unreasonable it must fall outside the "broad range" warranted by the totality of the circumstances. United States v. Jones, 531 F.3d 163, 174 (2d Cir. 2008); ante at **[15]**.

With these principles in mind, I proceed to consider the reasonableness challenge in this case.

### 3. The Reasonableness Challenge at Issue

I do not understand any member of the en banc court to suggest that, absent procedural error, a 24-month sentence for illegally trafficking in 16 guns would be substantively unreasonable in this case. Thus, the singular focus of this appeal is procedural error, specifically, the district court's justification for the challenged sentence and any fact finding underlying that justification.[5]

At the outset, I suggest that if the district court had stated simply, and without referencing any local circumstances, that upon careful consideration of the § 3553(a) factors, including the applicable Guidelines range, it concluded that a 24-month sentence was necessary (a) to reflect the seriousness of a crime that, after all, involves illegal trafficking in instruments that can take a human life; and (b) to ensure the adequate deterrence of such

---

[5] The district court's proper calculation of the Sentencing Guidelines, recognition of the Guidelines' advisory status, and careful consideration of § 3553(a) factors are not in dispute.

trafficking, we would not identify any procedural error in that justification. To demand more justification (or factual support) for such a modest variance would effectively challenge the district court's constitutionally mandated authority to weigh § 3553(a) factors for itself and would come close to presuming the unreasonableness of a non-Guidelines sentence. See Gall v. United States, 128 S. Ct. at 597.[6]

The district court did not, however, presume to justify its sentence by assessing the seriousness of gun trafficking offenses generally. Rather, it more modestly considered the seriousness of Cavera's crime by reference to the community for which the illegal guns were intended: New York City.[7] After United States v. Booker, 543 U.S. 220 (2005), a district court's consideration of local circumstances in assessing § 3553(a) factors cannot, by itself, manifest procedural error. This conclusion is compelled by our holding today that "we will not categorically proscribe any factor 'concerning the background, character, and conduct'

---

[6] We hold today that it is "[a]t the substantive stage of reasonableness review" that an appellate court "may consider whether a factor relied on by a sentencing court can bear the weight assigned to it" by the district court. See ante at **[14]**. While this review is deferential, it nevertheless follows that a factor or justification that could support a 24-month sentence might not bear the weight of a 24-year sentence. Cf. United States v. Jones, 531 F.3d at 174 ("[I]n determining substantive unreasonableness, a reviewing court will set aside only those outlier sentences that reflect actual abuse of a district court's considerable sentencing discretion."); United States v. Fernandez, 443 F.3d 19, 32 (2d Cir. 2006) ("The weight to be afforded any argument made pursuant to one of the § 3553(a) factors is a matter firmly committed to the discretion of the sentencing judge and is beyond our review, as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented." (emphasis added)). No such substantive reasonableness concern arises in this case.

[7] In a post-arrest statement, Cavera admitted knowing that the guns he sold were destined for New York City. See Presentence Report ¶ 15 (Feb. 2, 2005).

of the defendant, with the exception of invidious factors." Ante at **[14]** (quoting 18 U.S.C. § 3661). Accordingly, the only possible procedural challenge in this case relates to the factual basis for the district court's finding that gun smuggling to New York City has "the potential to create a substantially greater degree of harm" than in the mine-run case. United States v. Lucania, 379 F. Supp. 2d at 295. See post at **[5]** (Straub, J., dissenting) (concluding that neither record "data" nor "reasonably available statistics" support conclusion that "New York City's population density makes Cavera's offense more serious here than in the nation generally"); post at **[7]** (Sotomayor, J., dissenting) (stating that "district court's analysis and data are insufficient to support its conclusion that defendant-appellant deserved a severer sentence because firearms trafficking (1) is a more serious crime in densely populated areas . . . .").

a. *Kimbrough* "Closer Review" Does Not Apply in This Case

Before discussing why I identify no abuse of discretion in the district court's factual assessment of the seriousness of Cavera's crime, I note my disagreement with the dissenters' view that this case warrants "closer review" in light of Kimbrough v. United States, 128 S. Ct. at 575. See post at **[1-6]** (Sotomayor, J., dissenting). Kimbrough referenced the possibility of "closer review" in a context not present in this case, *i.e.*, when the Commission had relied on "empirical data and national experience" to frame a Guideline that addressed the particular concern at issue. 128 S. Ct. at 575 (internal quotation marks omitted). These circumstances were not present in Kimbrough because, although the Commission had

7

formulated specific Guidelines to treat crack cocaine more severely than powder cocaine or heroin, it did so to mimic the drug ratios of statutes establishing mandatory minimum sentences, and not to reflect relevant empirical data or national experience. Id. (explaining why case "present[ed] no occasion for elaborative discussion" of closer review possibility).

This case is a step further removed from Kimbrough. Although the Commission has promulgated Guidelines to address the unlawful receipt, possession, or transportation of firearms, see U.S.S.G. § 2K2.1, it has never considered whether the risk of harm posed by such crimes can vary depending on the intended destination for the guns. In short, not only are there no Guidelines reflecting empirical and experiential study of this issue, there are no Guidelines at all on the point.[8]

Some dissenting colleagues nevertheless urge "closer review" of the district court's

---

[8] The omission is noteworthy because, in the Sentencing Reform Act, Congress recognized the possibility that regional circumstances might differentiate some crimes, and it specifically invited the Sentencing Commission to consider "the community view of the gravity of the offense" in formulating the Guidelines. 28 U.S.C. § 994(c)(4); see United States v. Lucania, 379 F. Supp. 2d at 294 (citing Senate Report stating that relevant community could be either national or local "to take account of considerations based on pertinent regional differences"). While the application notes to certain Guidelines make reference to state and local law, see, e.g., U.S.S.G. § 2k2.1(b)(2) & app. n.6 (providing for consideration of "local law" among circumstances relevant to determining if defendant possessed firearms "solely for lawful sporting purposes or collection," without "unlawful" discharge or use); id. § 2H4.1(b)(4) & app. n.2 (defining "[a]ny other felony offense," with reference to "federal, state, [and] local law"); id. § 2L1.2 & app. n.1 (defining various increase-triggering offenses with reference to "federal, state, [and] local law"), the Commission has never undertaken an inquiry into how local differences, such as population density, might affect the risks of harm from illegal gun trafficking. Its traditionally formulated Guidelines reflect only national sentencing averages. See United States v. Lucania, 379 F. Supp. 2d at 294.

consideration of local circumstances by construing Commission silence as the equivalent of a policy determination that local circumstances are not properly factored into a sentencing decision. See post at [2-3] (Sotomayor, J., dissenting). I disagree. Certainly, that was not how we interpreted Commission silence when the Guidelines were mandatory, and we hardly have a basis for according greater weight to Commission silence after Booker. Title 18 U.S.C. § 3553(b)(1), which before Booker mandated Guidelines sentences unless the district court identified a factor "not adequately taken into consideration by the Sentencing Commission," expressly stated that, "[i]n determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission" (emphasis added). We had construed this language to mean that "Congress did not limit what a court may determine under § 3553(b) to have been inadequately considered by the Commission. Rather, this provision was left open to 'provide[] the flexibility necessary to assure adequate consideration of circumstances that might justify a sentence outside the guidelines.'" United States v. Lara, 905 F.2d 599, 605 (2d Cir. 1990) (quoting S. Rep. No. 98-225, at 78 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3262). The expectation was that, as district courts identified factors not considered (or inadequately considered) by the Commission and assigned them weight in imposing individual sentences, the Commission would collect this data and study it to determine the need for new or revised Guidelines.

Thus, long before Booker, the heightened risk of harm from gun trafficking into the

9

nation's most densely populated city had been cited as a factor not considered by the Commission that might support a departure from Guidelines ranges. See Reena Raggi, Local Concerns, Local Insights, 5 Fed. Sent'g Rep. 306 (1993);[9] see also Vincent L. Broderick, Local Factors in Sentencing, 5 Fed. Sent'g Rep. 314 (1993) (asserting that Sentencing Commission's silence on local conditions renders them a permissible ground for departure under 18 U.S.C. § 3553(b) as a fact not "adequately taken into consideration" in formulating the Guidelines); Charles P. Sifton, Theme and Variation: The Relationship Between National Sentencing Standards and Local Conditions, 5 Fed. Sent'g Rep. 303 (1993) (same). If the Commission had thought such a departure was unwarranted, it could have said so in a Guideline or policy statement (just as it has identified family circumstances, education, age,

---

[9] As support for the conclusion that the district court's analysis in this case was "at odds with the Sentencing Commission," post at [2] (Sotomayor, J., dissenting), Judge Sotomayor quotes the following language from my 1993 article: "When I voiced my concern to the Sentencing Commission about these guidelines for gun trafficking as they applied in New York, I was told that other parts of the country viewed gun crimes differently and that the guidelines were meant to reflect an average." Raggi, Local Concerns, Local Insights, 5 Fed. Sent'g Rep. at 306. Let me clarify that what is referenced is a telephone exchange between myself and one of the Commission staffers charged in the early years of the Guidelines with answering district judges' questions and hearing their concerns. Such an exchange hardly reflects the pronouncement of a formal Commission policy precluding consideration of local demographics in assessing potential harm from gun trafficking, much less a policy based on the sort of empirical or historical survey that Kimbrough suggested might prompt closer review of a non-Guidelines sentence. The adoption of such a policy would require formal procedures. See Mistretta v. United States, 488 U.S. 361, 394 (1989) (noting that the Commission's "rulemaking is subject to the notice and comment requirements of the Administrative Procedure Act" (citing 28 U.S.C. § 994(p)); see also 28 U.S.C. § 994(p) (requiring Commission to submit amended Guidelines to Congress for review).

10

etc., as circumstances not generally supporting departures, see U.S.S.G. §§ 5H1.1, 5H1.6). Indeed, even now, the Commission might take such action, and any resulting Guideline or policy statement would have to be considered by sentencing courts pursuant to § 3553(a)(4). But until that time, there is no legal support for us to conclude that Commission silence signals an intent to preclude judicial consideration of particular facts, and certainly no factual support to conclude that such silence is informed by the sort of empirical and experiential study that Kimbrough referenced as a basis for "closer review" of a non-Guidelines sentence.

        b.      The District Court's Factual Findings Do Not Manifest Clear Error

While I do not think this case calls for "closer review," whether it does or not, one thing is clear: closer review does not equate to de novo review of a sentencing court's factual findings. Such findings are reviewed only for clear error. See Gall v. United States, 128 S. Ct. at 600 (identifying error in appellate analysis that "closely resembled de novo review of the facts"); United States v. Jones, 531 F.3d at 173 (holding that "references to 'closer review' and 'significant justification'" do not "establish a higher standard of review than abuse of discretion" or permit review of district court's fact finding "for anything other than clear error"); cf. Maine v. Taylor, 477 U.S. 131, 144-45 (1986) (observing that, even where proffered justification for discrimination is subject to strict scrutiny, "the empirical component of that scrutiny, like any other form of factfinding, is the basic responsibility of district courts" and "shall not be set aside unless clearly erroneous" (internal quotation marks

11

omitted)).[10] To identify clear error, we must do more than entertain doubts about the district court's conclusions or hypothesize reasonable alternative findings; we must be "left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985) (defining clear error) (internal quotation marks omitted); accord Maine v. Taylor, 477 U.S. at 145 (applying clear error review to district court's factual findings in criminal case). The district court's finding that gun trafficking presents a greater risk of harm in New York City than in the mine-run case does not manifest such clear error.

The district court supported its finding by reference to three facts. The first two, that guns smuggled into New York City are (1) commonly acquired illegally and (2) then used for unlawful purposes, see United States v. Lucania, 379 F.3d at 295, required no empirical support. We would only have to look through our own docket history to take judicial notice of the fact that the Eastern District of New York is home to the city's five traditional organized crime families, numerous large-scale narcotics enterprises, and street gangs of all stripes – for all of whom guns are tools of the trade and gun violence a routine form of

---

[10] The dissenters' proposed "closer review" standard would require us to "test a district court's application of broad policy factors in order to ensure that the district court's conclusions can be objectively supported and are not based on faulty assumptions." See post at [5] (Sotomayor, J., dissenting). I cannot endorse this formulation of "closer review," which invites us to engage in precisely the kind of quasi-de novo review of which Gall expressly disapproved. 128 S. Ct. at 600. That said, as the following discussion indicates, if the dissenters' standard were to be applied to the district court's sentence here, it would clearly be satisfied.

12

communication.

The third fact cited by the district court is New York City's status as the most densely populated area of the country. Undisputed evidence shows that the average population density of the United States is 78 people per square mile, whereas the population density in parts of New York City included in the Eastern District of New York is 35,000 per square mile. See United States v. Lucania, 379 F. Supp. 2d at 295 n.3. That yields a ratio of approximately 1:450. To be sure, if a gunman, in any part of the country, shoots an intended victim and hits his target, the results are equally tragic. But if the gunman misses his target, the cited statistics plainly support an inference that the risk of injury, if not death, to a nearby person is many times greater in the Eastern District of New York than in most parts of the country. Similarly, if one imagines an inebriated person firing a gun into the air at random, the likelihood that it will hit someone is also far, far greater in the Eastern District of New York than in most other areas of the country. This is not to suggest that every time a gun is fired on a New York City street, at least 450 people are within range, but it shows that the number of people likely to be in range in New York is always so much higher than in many other areas of the country as to support the district court's finding of an increased risk of harm.[11]

---

[11] As this discussion indicates, I do not agree that "the impact of almost any crime will vary according to its location." Post at [4] (Sotomayor, J., dissenting). But I do think that after Booker, Kimbrough, and Gall, if a district court reasonably concludes that the location in which a particular crime was committed is relevant to a § 3553(a) factor, its consideration of that local fact manifests no procedural error. See generally United States v. Politano, 522

13

To the extent the district court's conclusion that trafficking guns to a densely populated city poses a heightened risk of harm is plainly grounded in common sense, our dissenting colleagues are dismissive. See post at [12-13] (Straub, J., dissenting) (observing that "reflexive evocation of common sense does not resolve the issue because of the countervailing evidence"); post at [6] (Sotomayor, J., dissenting) (noting "serious danger . . . that sentencing judges will dress their subjective views in objective trappings, either by using questionable empirical data or by invoking a 'common sense' at odds with reality"). In response, I begin with a word about the role of "common sense" in judicial proceedings.

When the issue in dispute is legal – the bulk of our appellate work – rulings must plainly be grounded in law, and not ascribed simply to common sense. But, when the issue to be resolved is factual, the law expects the factfinder – whether judge or jury – to draw on common sense and experience in making any determination. See 1 Leonard B. Sand et al., Modern Federal Jury Instructions ¶ 5.02, Instr. 5-4 (2005) (noting that jury should be instructed: "You should consider the evidence in light of your own common sense and experience, and you may draw reasonable inferences from the evidence"). Indeed, common sense and experience frequently provide the necessary link between a given fact (such as the

.

_____

F.3d 69, 74 (1st Cir.), cert. denied 129 S. Ct. 133 (2008) ("Post-Booker, it is now apparent that the district court has the discretion to take into account all of the circumstances under which Politano committed the offense, including the particular community in which the offense arose.").

14

classic example of a person entering a building wearing a wet raincoat) and a permissible inference (that it is raining outside). Because appellate courts are not factfinders, when we review a challenged factual inference we do not ourselves weigh competing evidence. We ask only whether any reasonable factfinder, applying common sense and experience to the task, could have drawn the challenged inference from the record facts according to the applicable burden of proof, which at sentencing is a preponderance of the evidence. See United States v. Yannotti, 541 F.3d 112, 129 (2d Cir. 2008) (noting that the preponderance standard applies at sentence); United States v. Vaughn, 430 F.3d 518, 525 (2d Cir. 2005) (same); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2513 (2007) (observing that preponderance burden requires demonstration that fact at issue "is more likely than not" true). As long as the answer is yes, we defer to that finding.

In Gall, the Supreme Court emphasized the deference reviewing courts owe district courts' factual findings. In part, this is because district courts have the advantage of seeing the parties and the evidence in the particular case and assessing credibility. See Gall v. United States, 128 S. Ct. at 597-98. But this is not the only reason. Such deference also reflects an acknowledgment of the general insights and judgment that district courts develop – a sort of judicial common sense – simply by virtue of imposing scores of sentences each year. See id. at 598 & n.7 (noting that "[d]istrict judges sentence, on average, 117 defendants every year"); accord United States v. Jones, 531 F.3d at 163 & n.4. Although our dissenting colleagues are dismissive of "talismanic incantations to local 'experience,'" post at [5]

15

(Sotomayor, J., dissenting), the Supreme Court has signaled otherwise, recognizing both before and after Booker that just sentences often depend on insights drawn from the district court's "day-to-day experience in criminal sentencing," Koon v. United States, 518 U.S. 81, 98 (1996), that are not always "'conveyed by the record,'" Gall v. United States, 128 S. Ct. at 597 (quoting amicus brief filed by Federal Public and Community Defenders and the National Association of Federal Defenders). While such insights may not be "quantifiable," United States v. Jones, 531 F.3d at 171 n.4, Gall makes clear that they are an important reason why, in reviewing non-Guidelines sentences, appellate courts must "give due deference to the district court's decision that the § 3553(a) factors, on the whole, justify the extent of the variance," 128 S. Ct. at 597.[12]

Our dissenting colleagues nevertheless insist – as a procedural matter – that more than

---

[12] The dissenters acknowledge district courts' "day-to-day experience in criminal sentencing," but contend that such experience does not enable district courts to "draw comparisons between defendants in different courts around the country" because a particular district court "judge's experiences are limited to his or her region." Post at [4] (Sotomayor, J., dissenting). In fact, when a district court concludes, as it did in this case, that "local circumstances" affect the "seriousness of the offense" and the need "to afford adequate deterrence," United States v. Lucania, 379 F. Supp. 2d at 290, 293, the court is not making point-to-point "comparisons between defendants in different courts around the country." Post at [4] (Sotomayor, J., dissenting). Rather, it is determining, as required under § 3553(a), whether, in light of those local circumstances and all other relevant considerations, the national averages reflected in the advisory Guidelines point toward a sentence that is "sufficient, but not greater than necessary" to effectuate the goals outlined in the sentencing statute. See United States v. Lucania, 379 F. Supp. 2d at 296 (concluding that "national 'average'" expressed in Guidelines did not reflect "increased risk of death or injury" from trafficking firearms into nation's most densely populated city). First-hand knowledge of conditions in other districts is not necessary to that determination.

16

common sense and experience was necessary to permit the district court to infer a heightened risk of harm from evidence of population density. Even before Booker, however, reviewing courts did not demand objective evidence to support Guidelines departures for extraordinary family circumstances, age, or other conditions that Commission policy statements noted were generally disfavored. See U.S.S.G. §§ 5H1.1, 5H1.6. To depart on such grounds, the district court had to find that the "discouraged factor . . . [was] present to an exceptional degree or in some other way ma[de] the case different from the ordinary case where the factor is present." Koon v. United States, 518 U.S. at 96; see also U.S.S.G. § 5K2.0; United States v. Huerta, 371 F.3d 88, 93-94 (2d Cir. 2004). Conducting such an inquiry, however, did not require the district court to cite evidence demonstrating that the defendant's particular circumstances were "exceptional" as a matter of empirical fact. Rather, district courts were asked to "make a refined assessment of the many facts bearing on the outcome, informed by [their] vantage point and day-to-day experience in criminal sentencing." Koon v. United States, 518 U.S. at 98 (emphasis added). In light of this precedent, to condition non-Guidelines sentences on the production of empirical evidence would, in effect, accord a presumption of unreasonableness to such sentences, in violation of the Sixth Amendment. See Gall v. United States, 128 S. Ct. at 597; Rita v. United States, 127 S. Ct. at 2466-67.

Our dissenting colleagues submit that they have, in fact, identified empirical evidence that demonstrates clear error in the district court's finding that high population density presents a greater risk of harm from gunfire to bystanders. For example, they cite news

17

stories reporting reductions in the number of innocent victims killed in New York City in recent years. See post at [8] (Straub, J., dissenting); post at [9] (Sotomayor, J., dissenting). Plainly, homicide is not the only form of injury that can be caused by gunfire.[13] Indeed, the reported decline in homicides is small comfort to the significant number of New Yorkers, many of them children, who are regularly injured by random gunfire.[14] In any

---

[13] We understand the district court's reference to homicide statistics to have been only illustrative, because illegal guns can certainly pose serious risks of harm short of death. Cf. Centers for Disease Control, "Surveillance for Fatal and Nonfatal Firearm-Related Injuries–United States 1992-1998" (2001), available at http://www.cdc.gov/mmwr/preview/ mmwrhtml/ss5002a1.htm (noting that, while death rate for firearm-related injuries is "substantially higher than [that for] all causes of injury combined," only 30% of firearm-related injuries resulted in death between 1993 and 1998).

[14] A brief review of news stories for the last eighteen months reveals the following:

– "NYPD Daily Blotter," N.Y. Post, Nov. 6, 2008, at 18 (reporting three persons hit by random gunfire outside subway station).

– "Shot Girl Was Hit in Crossfire," N.Y. Post, Oct. 22, 2008, at 21 (reporting 5-year-old girl who suffered collapsed lung after being shot in gang fight crossfire).

– "71-Year-Old Woman Hit by Stray Bullet in Brooklyn," WCBS, Oct. 1, 2008, http://wcbstv.com/topstories/stray.bullet.shooting.2.830513.html (reporting woman grazed by bullet while walking home from church).

– "Kids, 8 and 10, Injured by Stray Bullets in Brooklyn and Queens," N.Y. Daily News, Sept. 14, 2008, at 17 (reporting 10-year-old girl shot in shoulder when bullets raked Brooklyn block party and 8-year-old boy shot on side of forehead when getting into a car with his mother in Queens).

– "After a Boy's Shooting, 'Why' Is on Everyone's Lips," N.Y. Times, Aug. 6, 2008, at B2 (reporting critical shooting of 9-year old caught in crossfire in Crown Heights, Brooklyn).

– "15 Year-Old Is Fatally Shot in Harlem," N.Y. Times. June 30, 2008, at B3 (reporting

18

event, a reduction in homicides would not be enough to identify clear error in the district court's assessment of the risk presented by random gunfire in a densely populated

---

death of boy killed by stray bullet on 127th Street, near site where, two weeks earlier, 12-year-old boy had been injured by debris loosened by stray bullets).

– "An Innocent Errand Ends in Death for a Brooklyn Mother of Three," N.Y. Times, Apr. 1, 2008, at B1 (reporting death of woman hit by random gunfire in courtyard).

– "Girl, 9, Hit by Stray Bullet that Flies into Her Brooklyn Apt.," Newsday, Mar. 28, 2008 (reporting on 9-year-old girl hit in arm by bullet that crashed through window of her fifth floor apartment).

– "45 to Life in Slay," N.Y. Post, Jan 4, 2008, at 11 (reporting on sentencing of Queens man who killed innocent bystander while attempting to shoot person who shot assailant's brother).

– "Girl, 11, in Shoot Horror," N.Y. Post, Jan. 2, 2008, at 9 (reporting death of child when family stumbled into Bronx shootout on New Year's Eve).

– "Caught in Crossfire," N.Y. Daily News, Oct. 15, 2007, at 8 (reporting on various shooting incidents:
(1) 16-year-old boy shot in head by stray bullet when looking out window of Brooklyn apartment.
(2) 3-year-old girl grazed by bullet while visiting grandmother in Brooklyn.
(3) 12-year old shot in back by stray bullet when fight between rival gangs spilled onto Bronx street.
(4) 4-year-old girl shot in leg by stray bullet while jumping rope.
(5) 12-year-old Brooklyn girl shot in side when gunfire erupted on neighborhood street.

– "Slain Girl's Parents' Fury at 'Terror' Gang," N.Y. Post, July 3, 2007, at 4 (reporting on killing of 10-year-old girl caught in crossfire of Bronx gang shootout).

District judges in New York City know that these recent experiences are not unique. See Raggi, Local Concerns, Local Insights, 5 Fed. Sent'g Rep. at 306 (referencing press reports of sixteen children who were victims of random gunfire in ten-week period in 1990).

19

community. A reduction in random killings can, after all, be attributable to any number of factors, including an increased police commitment to getting illegal guns off the street, see Sworn Complaint ¶ 46, City of New York v. A-1 Jewelry & Pawn, Inc., No. 06 Civ. 2233 (E.D.N.Y. May 15, 2006) (alleging that 70,000 handguns were seized by the New York City Police Department from 1995-2005 "[v]irtually all . . . from individuals who were prohibited by law from possessing guns"); see also "Police Data Shows Increase in Street Stops," N.Y. Times, May 6, 2008, at B1 (reporting 145,098 street stops by police in first three months of 2008 as part of strategy to stop crime and find illegal guns), or extraordinary community precautions that tragically confirm the danger to innocent bystanders posed by urban gun violence, see "After a Boy's Shooting, 'Why?' Is on Everyone's Lips," N.Y. Times, Aug. 6, 2008, at B2 (reporting that residents of community "had learned to take careful steps to avoid getting caught in the middle of someone else's battle. They stayed indoors. They taught their children to hit the ground when a shot was heard."). Such measures, even when successful in reducing the number of times a gun is fired on New York City streets, do not alter the fact that, whenever a gun is fired, the population density of the community enhances the risk of injury beyond that of a mine-run case.[15]

---

[15] Insofar as the dissenters note that other, less densely populated communities report problems with random gunfire, post at **[10 n.6]** (Sotomayor, J., dissenting), sentencing courts in those locales will have to decide for themselves how those problems factor into the totality of circumstances relevant to § 3553(a) analysis. See United States v. Politano, 522 F.3d at 72 (affirming sentence imposed in District of Massachusetts where district court found, under § 3552(a), that "any reader of the daily newspapers is aware that the illegal trafficking of firearms at the street level is a significant contributing factor in what, without exaggeration

Nor is a different conclusion about the seriousness of Cavera's crime compelled by the supposed flaw that the dissenters purport to identify in the district court's reliance on a Justice Department study as evidence that "homicide rates in large urban areas remain substantially higher than in suburban and rural areas." United States v. Lucania, 379 F. Supp. 2d at 295 (citing U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, Homicide Trends in the U.S., Trends by City Size (hereafter Trends by City Size), http://www.ojp.usdoj.gov/bjs/homicide/city.htm (last visited Nov. 24, 2008)). Our colleagues note that the cited study discusses only absolute numbers of homicides rather than relative rates of homicides. They point to a table included in the same study showing that, when the number of homicides per 100,000 inhabitants is considered, cities with populations between 250,000 and one million have recently had higher homicide rates than cities (such as New York) with one million or more residents. See post at [6] (Straub, J., dissenting) (citing Trends by City Size: Homicide Victimization Rates per 100,000 Population for Cities over 100,000 by Population Group, http://www.ojp.usdoj.gov/bjs/homicides/tables/ vcitytab.htm (last visited Nov. 24, 2008)); see post at [7-8] (Sotomayor, J., dissenting).

This critique does not, in fact, undermine the district court's finding. The referenced

---

I think, can be called an epidemic of handgun violence in communities within this district"). The fact that, after Booker, Kimbrough, and Gall, judges sitting in other districts might reasonably conclude that the seriousness of gun smuggling into their communities is not adequately addressed by the Sentencing Guidelines does not make it procedurally unreasonable for the district court to have reached that conclusion in this case, which involves the nation's most densely populated city.

21

table shows that the rates of homicides for larger cities, whether their populations are 250,000 to 499,000; 500,000 to 999,000; or over one million, are <u>always</u> significantly higher than for small cities with populations of between 100,000 and 250,000. Indeed, over the 30-year period covered by the Department of Justice's statistics, on average, larger cities had homicide rates nearly 70% higher than that of small cities (<u>i.e.</u>, 20.2 homicides per 100,000 versus 11.9), and cities over one million had rates nearly double that of small cities (<u>i.e.</u>, 23.3 homicides per 100,000 versus 11.9). Over the last five years covered by the report (2001-2005), on average, the rate in larger cities has been approximately 52% higher than that in small cities (<u>i.e.</u>, 14.6 versus 9.6), and approximately 45% higher in cities over one million (<u>i.e.</u>, 14.0 versus 9.6). On this record, the district court was not obliged to explore the reasons why cities with populations between 250,000 and 500,000 sometimes show slightly higher homicide rates than cities with populations over one million. As already noted, to the extent the explanation for this phenomenon, as far as New York City is concerned, might rest with a decade-long commitment of increased police resources to removing illegal guns from the street, that initiative would not alter the fact that unseized guns continue to pose a greater risk of harm if discharged on the streets of a densely populated city. Thus, the district court did not misstate the import of recent homicide statistics, nor do those statistics demonstrate any clear error in its ultimate finding that trafficking guns into New York City is more serious than the mine-run case.

In any event, I do not understand it to be our role, at the procedural step of

22

reasonableness review, to engage in this kind of dissection of the empirical evidence cited by the district court.[16] Nor is it to identify competing studies or news articles pointing in other directions. As the majority opinion observes, such evidence is inevitably debatable. See ante [25] (holding that district court did not abuse its discretion in relying on potentially controversial economic theories to support findings relevant to need for deterrence). The question, at the procedural step of reasonableness review, is not whether we are persuaded to draw particular inferences from the evidence, but, rather, whether the district court committed clear error by doing so.

I identify no clear error in the district court's finding that gun trafficking to New York City is a sufficiently more serious crime than the mine-run case based on the high population density of the city as well as the likely illegal disposition and use of such guns. For that reason, as well as the heightened need for deterrence discussed in the majority opinion, I vote to uphold the challenged 24-month sentence and to affirm the judgment of conviction.

---

[16] Likewise, we do not expect district courts to take on the additional burden of acting as social scientists who must parse all available empirical evidence before reaching a conclusion.

STRAUB, *Circuit Judge*, concurring in Parts I and II.A., and dissenting in part. Judge Cardamone and Judge Sotomayor join in full and Judge Pooler joins in Part 3.

I join fully in my colleague's concurring and dissenting opinion. I write separately to emphasize what I believe reasonableness review entails in this case, and to explain why I believe Gerard Cavera's above-Guidelines sentence for conspiring to deal in and transport firearms, 18 U.S.C. §§ 371, 922(a)(1)(A) and (5), fails basic reasonableness review.

While it is now clear that the District Court "may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines," *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007) (internal quotation marks and brackets omitted), it is still the case that the justification for a particular sentence must follow from the facts and premises, and those premises must be, if not ineluctable, at least sound or reasonable, *see Gall v. United States*, 128 S. Ct. 586, 597 (2007). The District Court's conclusions here, however, that firearms smuggled into New York City pose a greater risk of harm than in the United States generally, and that "a more severe penalty is necessary to produce adequate deterrence," do not follow from the facts. *United States v. Lucania*, 379 F. Supp. 2d 288, 293-96 (E.D.N.Y. 2005). I appreciate the District Court's thoughtful and clearly stated consideration of the particular significance of Cavera's crime in New York City. However, viewed in light of the Supreme Court's recent guidance in *Kimbrough*, 128 S. Ct. 558, and *Gall*, 128 S. Ct. 586, the District Court's decision to enhance Cavera's sentence, as it stands, exceeded its allowable discretion. I would therefore remand this case for resentencing in light of those decisions.

**1. Standard of Review**

We review a district court's sentence for procedural and substantive reasonableness, a standard "akin to review for abuse of discretion." *United States v. Fernandez*, 443 F.3d 19, 27

1

(2d Cir.), *cert. denied*, 127 S. Ct. 192 (2006); *see also Gall*, 128 S. Ct. at 597. Pursuant to this standard, we review a district court's interpretation of the Sentencing Guidelines de novo and apply the clear error standard when evaluating a district court's findings of fact. *See United States v. Richardson*, 521 F.3d 149, 156 (2d Cir. 2008).

In *Kimbrough*, the Supreme Court explained that sentencing "courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines." 128 S. Ct. at 570 (internal quotation marks and brackets omitted).[1] However, district judges do not "have a blank check to impose whatever sentences suit their fancy." *United States v. Jones*, 531 F.3d 163, 174 (2d Cir. 2008); *see also United States v. Higdon*, 531 F.3d 561, 562 (7th Cir. 2008) (Posner, J.) (explaining that while an individual district court judge may now be free to impose "his own penal philosophy[,] . . . [a]s a matter of prudence, however, in recognition of the Commission's knowledge, experience, and staff resources, an individual judge should think long and hard before substituting his personal penal philosophy for that of the

---

[1] The government cites *United States v. Politano*, 522 F.3d 69 (1st Cir.), *cert. denied*, 129 S. Ct. 133 (2008), to argue that a district court is permitted to consider community-specific characteristics. As explained herein, I do not disagree as a general matter. However, I do not find this case to be particularly instructive or persuasive. In *Politano*, the District Court cited unidentified newspaper reports to establish that a firearms trafficking offense is serious and harmful within the specific community where Politano committed his crime. *Id.* at 72. The District Court then did not probe or explain whether the impact of the offense was more serious in its district than on average in the country. *Id.* The First Circuit assumed that the District Court had made a determination that the impact of the offense was more serious in the particular community where it was committed and failed to assess to any extent whether the relied-upon reports demonstrate what the District Court claimed. *Id.* at 74. In addition, the First Circuit failed to address what "closer review" may entail. *See Kimbrough*, 128 S. Ct. at 575.

This cannot be what the Supreme Court meant when it instructed appellate courts to "ensure that the district court committed no significant procedural error." *Gall*, 128 S. Ct. at 597. Nor can it be what the Court meant when it instructed appellate courts to determine whether a district judge's view that a particular characteristic of the defendant or his crime was an aggravating or mitigating factor was reasonable. *See id.* at 601.

2

Commission"). Indeed, the Supreme Court has explained that "closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range fails properly to reflect [18 U.S.C.] § 3553(a) considerations even in a mine-run case." *Kimbrough*, 128 S. Ct. at 575 (internal quotation marks omitted). And even where closer review does not apply, we have emphasized that a sentencing court must "give fair consideration to the Guidelines before imposing sentence [and] it must make 'an individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *Jones*, 531 F.3d at 170 (quoting *Gall*, 128 S. Ct. at 597) (citations omitted). And we will reverse a district court's factual conclusion as clearly erroneous if it is "without foundation." *United States v. Taylor*, 475 F.3d 65, 70 (2d Cir. 2007) (per curiam) (internal quotation marks omitted).

The precise question presented by this case is whether the District Court exceeded its allowable discretion when it *chose* to rely on empirical sociological data to draw conclusions, decided that the Guidelines do not account for the judge's sociological conclusions, and then based its sentence on those conclusions. In these circumstances, I believe we must examine whether the District Court's findings are supported by the data cited in order to determine that it has a "reasoned basis for exercising [its] own legal decisionmaking authority." *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007); *see also Gall*, 128 S. Ct. at 602 (deference is owed to sentencing court's "reasoned and reasonable decision"); *United States v. Anati*, 457 F.3d 233, 238 (2d Cir. 2006) (explaining, in dicta, that to the extent a judge decides "the special impact of [an] offense in a particular geographic community" is "a relevant circumstance," "there might have to be some empirical basis for deeming the impact of [that] offense in a particular community more serious than the assessment made by the Sentencing Commission"), *overruled*

3

*in part on other grounds by Irizarry v. United States*, 128 S. Ct. 2198, 2201-02 & n.1 (2008).[2] This, it seems to me, is what "reasonableness" review requires. It is not a question of whether the justification given is "sufficient," *cf. Gall*, 128 S. Ct. at 594, but of whether the justification follows from the facts and premises, and whether those premises are at least sound or reasonable. If the justification does not follow from the facts and permissible inferences, then the conclusions drawn are clearly erroneous.

The Supreme Court's analysis of the sentencing judge's use of age in *Gall* is instructive. In that case, the Eighth Circuit found that "the district court gave significant weight to an improper factor when it" likened Gall's sale of ecstasy at age twenty-one to the "impetuous and ill-considered actions" of persons under the age of eighteen reflected in "general studies." *United States v. Gall*, 446 F.3d 884, 890 (8th Cir. 2006), *rev'd*, 128 S. Ct. 586 (2007). The Court agreed with the Eighth Circuit that the studies on age and behavior "cited by the District Judge do not explain how Gall's specific behavior in the instant case was impetuous or ill-considered." *Gall*, 128 S. Ct. at 601 (internal quotation marks omitted). The Court, however, explained that the District Judge was not using the studies for that purpose, but instead was using the studies to address the defendant's character. *Id.* The Court then reasoned that "[g]iven the dramatic contrast between Gall's behavior before he joined the conspiracy and his conduct after withdrawing, it was not unreasonable for the District Judge to view Gall's immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future." *Id.* As the

---

[2] The District Court itself explained that a judge should be permitted to take into account differences in local concerns in sentencing only if the differences are "a) *founded in fact*; and b) justified by reasons of general applicability." *Lucania*, 379 F. Supp. 2d at 294 (emphasis added).

4

Court's analysis makes clear, while age is not an impermissible factor, a sentencing court's conclusions about the significance of a defendant's age must be reasonable. In *Gall*, the sentencing judge's conclusions about the defendant's character were reasonable because they followed from the evidence about the defendant's conduct as he grew older.

Where a district court's sociological and statistical findings, as to which it enjoys no special comparative advantage vis-à-vis the Sentencing Commission, *see Kimbrough*, 128 S. Ct. at 574,[3] do not reasonably follow from the evidence it cites, the court exceeds its allowable discretion and the sentence is unreasonable. In this case, in particular, two features of the District Court's analysis were unsound. I would thus find that the sentence is unreasonable and remand it to the District Court.

**2. The District Court's Use of Population Density**

The District Court first erred in concluding that New York City's population density makes Cavera's offense more serious here than in the nation generally. While it is possible that this is the case, as my dissenting colleague also explains, neither the data relied on by the District Court nor reasonably available statistics support that conclusion.

The District Court cited evidence showing that New York City is the most densely populated city in the country and evidence it claimed showed that "homicide rates in large urban areas remain substantially higher than in suburban and rural areas." *Lucania*, 379 F. Supp. 2d at 295 & n.3 (citing National League of Cities, *30 Most Densely Populated Cities*, http://www.nlc.org/about_cities/cities_101/187.aspx (last visited Nov. 20, 2008); U.S. Dep't of

---

[3] Perhaps it also bears noting that generalist judges may not be the best equipped for this type of sociological and statistical analysis. *See* Michael C. Dorf, *Foreword: The Limits of Socratic Deliberation*, 112 HARV. L. REV. 4, 53 n.278 (1998).

Justice, Office of Justice Programs, Bureau of Justice Statistics, *Homicide Trends in the U.S.,*

*Trends by City Size* (hereinafter *Trends by City Size*),

http://www.ojp.usdoj.gov/bjs/homicide/city.htm (last visited Nov. 20, 2008)). It then reasoned

that an above-Guidelines sentence would not cause unwarranted disparities because "[f]irearms

are less likely to cause harm in more rural areas, if only because they are less likely to cause harm

to innocent bystanders." *Lucania*, 379 F. Supp. 2d at 296.

But, nothing in the reports cited by the District Court supports the conclusion that the risk

of harm from firearms is greater in more densely populated cities than in the rest of the country.

According to the data cited, there are more homicides in large cities than in small cities and

suburban and rural areas. *See Trends by City Size.* The report cited, however, does not compare

"homicide rates" in these geographic subdivisions, as the District Court apparently believed, *see*

*Lucania*, 379 F. Supp. 2d at 295; rather, it compares the absolute number of homicides in large

cities and other areas. As my dissenting colleague notes, when homicide victimization rates per

100,000 inhabitants are considered, the data reflect that recently homicide rates have not directly

correlated with city size: cities with populations between 250,000 and one million have higher

homicide rates than cities with one million or more residents. *See Trends by City Size: Homicide*

*Victimization Rates per 100,000 Population for Cities over 100,000 by Population Group,*

http://www.ojp.usdoj.gov/bjs/homicide/tables/vcitytab.htm (last visited Nov. 20, 2008).[4]

When we turn to the key metric — relative rates of gun-related homicides in New York

---

[4] This remained true in 2006 and 2007. *See* U.S. Dep't of Justice, Federal Bureau of Investigation, CRIME IN THE UNITED STATES: 2007, tbl.16, *available at* http://www.fbi.gov/ucr/cius2007/data/table_16.html (last visited Nov. 20, 2008); U.S. Dep't of Justice, Federal Bureau of Investigation, CRIME IN THE UNITED STATES: 2006, tbl.16, *available at* http://www.fbi.gov/ucr/cius2006/data/table_16.html (last visited Nov. 20, 2008).

City versus elsewhere — the statistics do not support the District Court's conclusion. Homicide rates in the *region* that includes New York City appear to *reflect* the national average, while "[r]ates of murder, and especially those involving guns, are higher in southern regions of the United States--in the East South Central, West South Central, and the South Atlantic regions." U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Homicide Trends in the U.S., Regional Trends*, http://www.ojp.usdoj.gov/bjs/homicide/region.htm (last visited Nov. 20, 2008) ("The rates of the Middle Atlantic [New Jersey, New York, Pennsylvania] and East North Central regions were closest to the national average of all regions."). In addition, in view of the fact that almost eighty percent of the United States population lives in urban areas, *see* U.S. Census Bureau, STATISTICAL ABSTRACT OF THE UNITED STATES: 2004-2005, *Population* 28, tbl.25, *available at* http://www.census.gov/prod/2004pubs/04statab/pop.pdf (last visited Nov. 20, 2008), the assumption that New York City is far from the national average just because most other locales are *more* rural, without further analysis, seems tenuous at best.

Nor, as my dissenting colleague points out, do the data suggest that innocent bystanders face a heightened risk of harm from firearms in New York City. In 2007, "[v]ery few victims of homicides were strangers to their perpetrators or were killed in random attacks." Press Release, New York Police Department, *Mayor Bloomberg and Commissioner Kelly Announce that City is on course to set a New Record in Crime Reduction – Fewest Murders Since Records Have Been Kept*, No. 2007-066 (Dec. 26, 2007), http://www.nyc.gov/html/nypd/html/pr/pr_2007_066.shtml (last visited Nov. 20, 2008); *see also* Al Baker, *City Homicides Still Dropping, to Under 500*, N.Y. TIMES, Nov. 23, 2007, at A1 (reporting that the Police Department's official crime statistics showed in November 2007 that "with roughly half the killings analyzed, only 35 were found to

7

be committed by strangers, a microscopic statistic in a city of more than 8.2 million"). This appears to have been the case at the time of Cavera's criminal conduct as well. Homicide statistics for 2004 reflect that "[s]treet murders are down. Innocent bystanders, once the subject of so many screaming headlines, no longer need Kevlar. . . . New Yorkers are far less likely to be killed by a stranger or casual acquaintance now than 15 years ago." Shaila K. Dewan, *As Murders Fall, New Tactics Are Tried Against Remainder*, N.Y. TIMES, Dec. 31, 2004, at B1; *see also* Greg Gittrich, *Death (Mostly) by Association*, N.Y. DAILY NEWS, Oct. 1, 2004, at 3 (quoting Police Commissioner Raymond Kelly in 2004 as stating that "[i]t is highly unlikely that a tourist or a law-abiding citizen would be the victim of murder"). If nothing else, the statistics show that it is neither obvious nor common sense that firearms present a heightened risk of injury to bystanders in New York City because it is densely populated, at least not in the recent years during which Cavera committed his crime.[5]

In sum, the fact that more homicides occur in large cities than in rural or suburban areas does not support the inference that the *rate* of homicides is greater in New York City than *on average* in this country. Even assuming a higher homicide rate in New York City, the fact that New York City is more densely populated does not support the inference that more innocent bystanders may be hurt by gun violence in New York City than on average in this country. And even assuming that more guns in New York City means more potential for harm here than on

---

[5] The FBI specifically cautions readers of its annual CRIME IN THE UNITED STATES report against ranking jurisdictions, noting that several variables, including population density, "affect the volume and type of crime occurring from place to place," and warning that "meaningful comparisons" require examination of "all the variables that affect crime in a . . . city . . . ." U.S. Dep't of Justice, Federal Bureau of Investigation, CRIME IN THE UNITED STATES: 2007, *Caution Against Ranking: Variables Affecting Crime*, available at http://www.fbi.gov/ucr/cius2007/about/variables_affecting_crime.html (last visited Nov. 20, 2008).

8

average elsewhere, there is nothing to support the assumption that *trafficked* guns in New York City are more likely to cause harm than they would on average in the country.

### 3. The District Court's Use of New York's Strict Gun Laws

The District Court also erred in concluding that "a more severe penalty is necessary to produce adequate deterrence." *See Lucania*, 379 F. Supp. 2d at 295. The majority suggests that the District Court's deterrence rationale has "considerable support." Maj. Op. at [23]. I do not disagree, as a general matter, that a district judge may rely on the need for greater deterrence based on a finding that firearms trafficking into New York City is more profitable than on average nationwide.[6] But here, ultimately, there is no support, much less "considerable support" for the finding that firearms trafficking into New York City is more profitable than firearms trafficking on average in the country.

The article the District Court relied on to note parenthetically that New York City is "one of the 'unusual areas' to which running guns is a profitable enterprise" does not make the claim that gun running into New York City is *more* profitable than gun running on average nationwide. *See Lucania*, 379 F. Supp. 2d at 295 (citing Gary Kleck, *BATF Gun Trace Data and the Role of Organized Gun Trafficking in Supplying Guns to Criminals*, 18 ST. LOUIS. U. PUB. L. REV. 23, 41 (1999) (hereinafter Kleck, *BATF Gun Trace Data*)). In fact, as my dissenting colleague also explains, the study only *speculates* that "there may well be unusual areas, such as New York City, Washington, D.C., or Boston, where the supply of legally owned guns and stolen guns circulating among criminals is low enough to leave room for criminal entrepreneurs to make a

---

[6] This would be uncontroversial where a district judge finds, for example, that a particular defendant was motivated by the potential for greater profits in New York than elsewhere. But here, no such finding of Cavera's motivations was made.

9

living selling guns illegally." Kleck, *BATF Gun Trace Data*, at 41.

The study's main conclusion is that "organized high-volume gun trafficking appears to account for a few percent of the guns acquired by criminals," thus refuting the theory that trafficking accounts for a significant share of criminals' guns. *Id.* at 42 ("Criminals obtain guns . . . . primarily by way of unrecorded, one-at-a-time transfers, some legal, some not, from people not in the illegal gun trafficking business. . . . [O]rganized trafficking of guns . . . accounts for no more than a tiny share of the guns obtained by criminals."). In line with that, the study undermines the notion that firearms trafficking is a significant source for criminals even in cities with strict gun laws when it notes, referring to Boston, that "even in a city subject to unusually strict gun laws, where opportunities for gun traffickers to profit *should* be at their maximum, probably less than 7% of crime guns recovered by police[] showed some solid indication of having been trafficked." *Id.* at 28-29 (emphasis added). If the vast majority of crime guns are being obtained through routes other than illegal gun trafficking, then the demand for trafficked guns and thus potential profits may not be as high as otherwise assumed. Moreover, evidence that guns cost more in New York City than elsewhere does not establish that greater profits are available in the City than in other destinations for trafficked guns. *See* Maj. Op. at **[23-24 & n.14]**. Increase in the cost of a gun does not automatically lead to increased profits if the expenses also go up, say, as a result of the additional efforts needed to avoid stricter gun control enforcement.[7]

Even assuming the evidence supports an inference that higher profits are available, the District Court did not explain how that made New York City different from other places in the

_____

[7] As my dissenting colleague also emphasizes, I find the majority's efforts to bolster the District Court's rationale through economic theories troublesome.

10

country where gun trafficking occurs. It certainly bears keeping in mind that the purpose of New York State's very strict gun laws is undermined when guns are brought into the state illegally; however, *that* problem was the main reason for 18 U.S.C. § 922(a), and presumably its accompanying sentences, in the first place. Section 922(a)(5) was passed specifically to remedy the major problem created by persons in states with restrictive laws obtaining guns from states with less restrictive gun control laws. *See, e.g.*, S. REP. No. 90-1097, *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2164 ("Two prime sources of firearms to criminals, juveniles, mental defectives, and crime-bent individuals which involve access to guns through interstate routes are the mail-order common carrier source and the out-of-state, nonresident source. . . . Because of interstate, nonresident purchases of firearms for criminal purposes, the laws of our States and their political subdivisions are circumvented, contravened, and rendered ineffective.").[8] Thus, as my dissenting colleague also notes, the Guidelines may already account for any deterrence rationale.

Certainly a potential for greater profits in a particular locale and a need for greater deterrence are not inconsequential matters when determining the appropriate sentence. Here, however, the conclusion that increased profits are to be had from trafficking guns into New York City does not follow from the evidence. The District Court failed to explain how the data cited supported an inference that greater profits were available to gun traffickers targeting New York City, and failed to explain how the Guidelines range inadequately accounts for the potential for greater profits given that the statute was aimed at combating that problem in the particular locales

---

[8] Section 922 was originally enacted by Section 902 of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, 229, and was later amended by Section 102 of the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1217-18.

with strict gun laws.

**4. Conclusion**

For these reasons, I would find that the links between the facts and the conclusions in this case are so tenuous as to verge on speculation and that the sentence does not survive reasonableness review. While a need for greater deterrence and a potential greater risk to innocent bystanders are indubitably valid concerns for a sentencing judge, when a district court bases its finding that these factors are present on sociological data, there must be a reasoned basis for concluding that the data support the finding. Here, the perceived needs are not founded in the facts, the data cited do not support the inferences drawn, and reflexive evocation of common sense does not resolve the issue because of the countervailing evidence. In reviewing sentences, we would be wise to recall that "[i]t is our duty to see that the force of the state, when it is brought to bear through the sentences of our courts, is exerted with the maximum we can muster of rational thought, humanity, and compassion." Marvin E. Frankel, CRIMINAL SENTENCES: LAW WITHOUT ORDER 124 (1973). The District Court's reasoning, as it stands, leaves me wholly unconvinced that the inferences the District Court drew from the record facts and conclusions it made to support Cavera's above-Guidelines sentence were reasonable or rational. For these reasons I join my colleague's concurring and dissenting opinion. I would remand to the District Court for resentencing in light of *Kimbrough*, 128 S. Ct. 558, and *Gall*, 128 S. Ct. 586.

12

SOTOMAYOR, *Circuit Judge*, joined by Judge CARDAMONE and Judge STRAUB, concurs in part and dissents in part. Judge POOLER joins, in part, the dissent.[1]

I join in the majority's conclusions in Parts I and II(A) regarding our authority to review sentencing decisions. But I dissent from the majority's overly deferential review of the district court's variance, on general policy grounds, from the Sentencing Guidelines; and I join in my colleague's dissenting and concurring opinion. None of the district court's stated reasons for its variance were adequately supported by objective criteria. Consequently, the sentence should be vacated and the case remanded.

As the majority recognizes, the Supreme Court has held that sentencing courts, in certain circumstances, are authorized to weigh generally applicable policy factors. Maj. Op. at 15 (citing *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007)). The Supreme Court, however, has not suggested that this power is unfettered. To the contrary—and as acknowledged by the majority (Maj. Op. at 16 & n.9)—the Supreme Court has distinguished different categories of cases to which varying degrees of appellate scrutiny apply. *Kimbrough*, 128 S. Ct. at 574–75. In the case before us, "closer review" is warranted because the district court "varie[d] from the Guidelines based solely on the judge's view that the Guidelines range fail[ed] properly to reflect [18 U.S.C.] § 3553(a) considerations even in a mine-run case." *Id.* at 575 (internal quotation marks omitted). The Supreme Court, however, did not elaborate on what it meant by "closer review," and the majority opinion avoids fleshing out this standard. Although its contours remain imprecise,

---

[1] Judge Pooler does not join, and takes no position, in the discussion regarding the district court's conclusion that defendant-appellant's offense was more harmful than the national average offense to which the Guidelines catered because the guns were destined for an urban and densely populated area.

1

"closer review" must amount to more than the majority's excessive deference to the district court's decision, which risks a regression of the sentencing process to the "greatest deficiencies of the pre-Guidelines regime," namely "its failure to provide for review of the decisions of sentencing judges and its failure to ensure that the sentencing judge's exercise of discretion was informed by authoritative criteria and principles." Kate Stith & José A. Cabranes, *Judging Under the Federal Sentencing Guidelines*, 91 Nw. U. L. Rev. 1247, 1253–54 (1997).[2]

Closer review is warranted where, as happened in this mine-run case, a district court implements a policy decision applicable to a wide class of offenders that is at odds with the Sentencing Commission. As the district court recognized, despite Congress's direction to consider the "community view of the gravity of the offense," 28 U.S.C. § 994(c)(4), "[t]he [Sentencing] Commission has, so far, never accepted the invitation to craft regional Guidelines," at least with respect to the firearms trafficking at issue in this case. *United States v. Lucania*, 379 F. Supp. 2d 288, 294 (E.D.N.Y. 2005); see Reena Raggi, *Local Concerns, Local Insights*, 5 Fed. Sent'g Rep. 306, 306 (1993) ("When I voiced my concern to the Sentencing Commission about these guidelines for gun trafficking as they applied in New York, I was told that other parts of the country viewed gun crimes differently and that the guidelines were meant to reflect an average."). But the Sentencing Commission has deemed regional or population-based adjustments to be

---

[2] The result of these failures was evident in a Second-Circuit study conducted prior to the Guidelines, in which trial judges were asked to sentence hypothetical offenders using identical presentence reports. Anthony Partridge & William B. Eldridge, *The Second Circuit Sentencing Study: A Report to the Judges of the Second Circuit* 1–3 (1974). The disparities were vast. Punishments for a bank robber ranged from five to eighteen years in prison. *Id.* at A-9. A seller of heroin was incarcerated from one to ten years depending on the judge. *Id.* at A-11. The study concluded that the sentencing pattern displayed in this Circuit was "not one of substantial consensus with a few sentences falling outside the area of agreement. Rather, it would appear that absence of consensus is the norm." *Id.* at 9.

appropriate in other, limited circumstances.[3] Thus, the Sentencing Commission's decision not to differentiate firearms trafficking sentences based on the firearms' destinations— despite a general invitation from Congress, a specific suggestion from at least one federal judge and the Sentencing Commission's consideration of population and locale in another circumstance—suggests a deliberate "balance" between "the comparative virtues and vices of broad, simple categorization and detailed, complex subcategorization." U.S. Sentencing Guidelines Manual Ch. 1 Part A.1.3.

Closer review is also appropriate because the judge's sentence, in addition to being in tension with the Sentencing Commission, was not grounded in the district court's "discrete institutional strengths." *Kimbrough*, 128 S. Ct. at 574; *see* Maj. Op. at 15–16 ("[O]ur review must be informed by the discrete institutional strengths of the Sentencing Commission and the district courts.") (internal quotation marks omitted). A sentencing judge's expertise lies in his "greater familiarity with . . . the individual case and the individual defendant before him than the [Sentencing] Commission or the appeals court." *Kimbrough*, 128 S. Ct. at 574 (internal quotation marks omitted). The district court's competence wanes as it moves from a case's particularities evaluated through the framework of § 3553(a) to overarching considerations of

---

[3] *See, e.g.*, U.S. Sentencing Guidelines Manual § 2H4.1(b)(4) & cmt. n.2 (defining "any other felony offense" with reference to "federal, state, or local law"); *id.* § 2K2.1(b)(2) & cmt. n.6 (allowing for reduction in offense level if firearms were possessed solely for lawful sporting or collecting purposes, depending upon, *inter alia*, "the extent to which possession was restricted by local law"); *cf. U.S.S.C. Public Hearing Panel V*, United States Sentencing Commission (Mar. 15, 2006) (Statement of John Rhodes, Federal Defenders of Montana), *available at* http://www.ussc.gov/hearings/03_15_06/0315USSC.pdf (opposing proposed Guidelines enhancement for firearms trafficking based on existence of "unlawful scheme" because "what's an unlawful scheme in the District of Columbia may not be an unlawful scheme in Montana. So [under the proposed enhancement] . . . you're going to run into the problem of reading regional disparity").

criminal jurisprudence. For example, a district court is uniquely positioned to make a refined assessment of whether a crack/powder sentencing disparity is warranted because the court sentences both defendants accused of crack-related crimes as well as defendants accused of cocaine-related crimes. *See Koon v. United States*, 518 U.S. 81, 98 (1996) (explaining that district courts have "an institutional advantage over appellate courts" in using their "day-to-day experience in criminal sentencing" to make a "comparison with the facts of other Guidelines cases"). But the district judge is not similarly well-situated to draw comparisons between defendants in different courts around the country: A judge in Brooklyn who is evaluating the relative dangers of gun trafficking throughout the nation enjoys no institutional advantage over appellate courts or the Sentencing Commission, if only because the judge's experiences are limited to his or her region. A district court strays far from its expertise in varying from the Guidelines based on its disagreement with the Sentencing Commission—whose Congressionally mandated *raison d'être* is "to formulate and constantly refine national sentencing standards," *Kimbrough*, 128 S. Ct. at 574—as to the proper national penal policy in response to regional differences relating to firearms trafficking.

In her concurrence, Judge Raggi argues that this case does not warrant closer review because the Sentencing Commission "has never considered whether the risk of harm posed by [firearms trafficking] crimes can vary depending on the intended destination for the guns." Concurring Op. at 8. But the impact of almost any crime will vary according to its location. *See, e.g.*, Vincent L. Broderick, *Local Factors in Sentencing*, 5 Fed. Sent'g Rep. 314, 314 (1993) (arguing that "the theft of a horse would have had entirely different significance in Montana and in Manhattan"). To argue that closer review is inappropriate unless the Sentencing Commission

4

has explicitly disfavored a particular local consideration "in a Guideline or policy statement" (Concurring Op. at 10–11) ignores the uniformity at the heart of the Guidelines. *See* U.S. Sentencing Guidelines Manual Ch. 1 Part A.1.3 ("Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders."). "Because one of the major purposes of the Guidelines was to eliminate unjustified disparities in sentences among similarly situated defendants," we should consider the Sentencing Commission to have "adequately taken a circumstance into consideration" when, as in this case, the defendant's offense "fits squarely within the language of the Guidelines" and the Sentencing Commission has made "conscious choices" regarding "the circumstances underlying the offense conduct." *United States v. Stultz*, 356 F.3d 261, 266–67 (2d Cir. 2004) (internal quotation marks and brackets omitted).

I believe that "closer review" means that we must test a district court's application of broad policy factors in order to ensure that the district court's conclusions can be objectively supported and are not based on faulty assumptions. This review does not amount to a policy debate. To the contrary, our review must focus on the district court's articulated reasons and cited authority, evaluating whether the latter support the former. And despite Judge Raggi's representation (Concurring Op. at 12 n.10), such closer review does not mean that we substitute our own sentencing predilections for those of the district court. *See Gall v. United States*, 128 S. Ct. 586, 600 (2007) (criticizing appellate court's usurpation of district court's fact-finding role). It does, however, mean that district courts cannot immunize their decisions from appellate review by talismanic invocations to local "experience" and "a sort of judicial common sense." *See* Concurring Op. of J. Raggi at 14–15. For example, in *Kimbrough*, the district court did not rest

5

its policy variance from the Guidelines solely upon its own courtroom experiences or legal hypotheses; instead it referenced the Sentencing Commission's extensive research and reports criticizing the crack/powder disparity. *See* 128 S. Ct. at 568, 575.[4] To suggest that appellate courts should affirm a sentencing rationale if it is plausible under any set of assumptions reduces the Guidelines and appellate courts to what they are clearly not: "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).

As the district court recognized in this case, arbitrary and subjective considerations, such as a judge's feelings about a particular type of crime, should not form the basis of a sentence. *Lucania*, 379 F. Supp. 2d at 296. The majority and I agree. Maj. Op. at 21; *cf.* Charles P. Sifton, *Theme and Variations: The Relationship Between National Sentencing Standards and Local Conditions*, 5 Fed. Sent'g Rep. 303, 303 (1993) (arguing that a sentence would create unwarranted disparity if it were motivated by "an effort to set aside national norms on the basis of local concerns without examining either the factual or legal significance of those concerns"). Yet a serious danger exists that sentencing judges will dress their subjective views in objective trappings, either by using questionable empirical data or by invoking a "common sense" at odds with reality. We only encourage this confusion if we signal that our review of sentencing decisions is cursory.

---

[4] Likewise, in this case, when the district court varied from the Guidelines because of defendant-appellant's advanced age and the "inverse relationship between age and recidivism," the district court cited numerous cases, many of which, in turn, relied upon a recidivism study of over 6,000 individuals that was conducted in 2004 by the Sentencing Commission. *Lucania*, 379 F. Supp. 2d at 297–98 (citing, *inter alia*, *United States v. Eberhard*, 2005 WL 1384038, at *10 (S.D.N.Y. June 9, 2005) (citing United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004)).

I do not suggest that the thoughtful and respected district judge in this case sentenced according to a caprice. His detailed opinion and its careful discussion of the § 3553(a) factors demonstrate otherwise. The dialogue between trial and appellate courts depends upon the candor of all judges, and the district court here is to be commended for its thorough explanation of its sentencing decision. Nevertheless, the district court's analysis and data are insufficient to support its conclusion that defendant-appellant deserved a severer sentence because firearms trafficking (1) is a more serious crime in densely populated areas, and (2) requires greater deterrence in areas with restrictive gun laws. For that reason, I believe that the enhanced sentence that the district court imposed on defendant-appellant should be vacated and remanded for reconsideration by the district court.

With respect to the seriousness of the offense, the district court relied on data compiled by the Department of Justice, which indicated that "homicide rates in large urban areas remain substantially higher than in suburban and rural areas." *Lucania*, 379 F. Supp. 2d at 295 (citing U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Homicide Trends in the U.S., Trends by City Size*, http:// www.ojp.usdoj.gov/bjs/homicide/city.htm). Yet the data say nothing about the homicide rate in New York City, and they do not show that a gun in New York City is more likely to hurt people than a gun elsewhere. More generally, the data do not demonstrate that homicide rates increase as population density increases because they do not consider the population density of a city, but only the total population. To the extent that the data are relevant, a district court could conclude that gun trafficking into more populated cities is *less dangerous* than gun trafficking elsewhere because the data demonstrate that over the last five years covered by the report (2001–2005), the average homicide rate in cities with populations

7

between 250K–499K was approximately 10% higher than the homicide rate in the largest cities. *See* U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Homicide Trends in the U.S., Homicide Victimization Rate*, http://www.ojp.usdoj.gov/bjs/homicide/tables/vcitytab.htm (last visited November 19, 2008) ("DOJ Homicide Statistics").[5] The same data could support either a harsher or a more lenient sentence, and some of my colleagues' reasoning suggests that this Court would be required to affirm either outcome. *See* Concurring Op. of J. Raggi at 6 (arguing that there was no procedural error where the district court "modestly considered the seriousness of [defendant-appellant]'s crime by reference to the community for which the illegal guns were intended"). Although district courts need not always rely upon empirical data when varying from the Guidelines, a sentence

---

[5] The statistics cited by the district court indicate that, in 2005 (when defendant-appellant was sentenced (Maj. Op. at 4)), the homicide rates per 100,000 people were as follows:

| *Population*: | *One Million +* | *500K - 999K* | *250K - 499K* | *100K - 249K* |
|---|---|---|---|---|
| *Homicide Rate:* | *13.0* | *14.8* | *15.2* | *10.1* |

DOJ Homicide Statistics. These data indicate that, in 2005, the homicide rate for cities with populations of 250K–499K was approximately 17% greater than the homicide rate of the largest cities. Furthermore, it is noteworthy that New Orleans and Gary, Indiana, which did not even rank among the 30 most densely populated American cities (based on population per square mile) according to the resource relied upon by the district court, have had the highest homicide rates in the country. *See* National League of Cities, *30 Most Densely Populated Cities*, http://www.nlc.org/about_cities/cities_101/187.aspx (last visited November 8, 2008); Rick Jervis, "New Orleans Homicides up 30% Over 2006 Level: City on Track to Retain Most-Murderous Label," *USA Today*, Jan. 3, 2008. Yet, following Judge Raggi's reasoning (Concurring Op. at 21–22), a sentencing judge would be correct to infer a heightened risk of harm from firearms trafficking in a more densely populated but safer American city. *But see* Hanna Rosin, "American Murder Mystery," *The Atlantic*, July/Aug. 2008, *available at* http://www.theatlantic.com/doc/200807/memphis-crime (exploring why "America's most dangerous spots" now include cities such as "Florence, South Carolina; Charlotte-Mecklenburg, North Carolina; Kansas City, Missouri; Reading, Pennsylvania; Orlando, Florida; [and] Memphis, Tennessee").

should not be sustained when the data cited by a district court undermine its own conclusions.

The district court implied that common sense dictates that a gun is more dangerous in more densely populated areas because of the higher likelihood that random bystanders might be shot. *Lucania*, 379 F. Supp. 2d at 296. But the district court erred in not scrutinizing more closely its "common sense" assumptions. Even if true that there is a slightly higher statistical probability that a gun will cause harm to a bystander in a densely populated area, it does not necessarily mean that the incremental increase in dangerousness is worthy of an increase in the sentence imposed. Moreover, the "vast majority" of homicide victims in New York City last year were not strangers to their assailants. Al Baker, *City Homicides Still Dropping, to Under 500*, N.Y. Times, Nov. 23, 2007, at A1 (concluding that "[t]he low number of killings by strangers belies the common imagery that New Yorkers are vulnerable to arbitrary attacks on the streets, or die in robberies that turn fatal"). This means that defendant-appellant received an increase in his sentence based on mere speculation that one of the guns he sold might have harmed a bystander in New York City, *and* that this harm would not have happened if he had sold the guns in a less densely populated area. The district court did not sufficiently analyze whether the risk of harm to bystanders in New York City justified a more severe sentence for defendant-appellant. *See United States v. Anati*, 457 F.3d 233, 238 (2d Cir. 2006) (noting, in *dicta*, that to the extent that "the special impact of [an] offense in a particular geographic community . . . might be relevant, there might have to be some *empirical basis* for deeming the impact of a heroin offense in a particular community more serious than the assessment made by the Sentencing Commission." (emphasis added)), *overruled in part on other grounds by Irizarry v. United States*, 128 S. Ct. 2198, 2201–02 & n.1 (2008). Instead, it simply assumed that these weapons posed a greater danger in New York

9

City than elsewhere because of population density.[6]

The district court's other rationale for imposing a non-Guidelines sentence was based on "general deterrence." The majority affirms the district court's sentence on this basis (Maj. Op. at 23–26), even though the district court's reasoning was unsubstantiated and unconvincing. In concluding that firearms trafficking is more profitable in New York City than in less tightly regulated areas, the sentencing judge's sole support was a law review article that hypothesized—without the benefit of data— that "there may well be unusual areas, such as New York City, Washington, D.C., or Boston, where the supply of legally owned guns and stolen guns circulating among criminals is low enough to leave room for criminal entrepreneurs to make a living selling guns illegally." Gary Kleck, *BATF Gun Trace Data and the Role of Organized Gun Trafficking in Supplying Guns to Criminals*, 18 St. Louis Univ. Pub. L. Rev. 23, 41 (1999). The

---

[6] In her concurrence, Judge Raggi cites several newspaper articles not relied upon by the district court as evidence of "the significant number of New Yorkers, many of them children, who are regularly injured by random gunfire." Concurring Op. at 18–19. This parade of horribles is not limited to New York City. *See, e.g.,* Jon Gambrell, "Curfew Widened in Crime-Ridden Arkansas Town," *Houston Chronicle*, Aug. 17, 2008, at A8 (describing residents of Helena-West Helena sleeping on floors of their houses out of fear of stray bullets). In addition, a brief review of headlines from the city of New Orleans during the last eighteen months uncovered numerous articles describing victims of stray bullets, including the following:

– "New Orleans Police Blotter," *New Orleans Times-Picayune*, Oct. 9, 2008, at 3 ("A 17-year-old girl was hit in the leg by one or more stray bullets fired by a stranger.").

– Katy Reckdahl, "Woman with Gun Terrorizes Children," *New Orleans Times-Picayune*, July 17, 2008, at 1.

– Mary Sparacello, "Housing Authority Reining in Parties: Kenner Shooting Leads to Regulations," *New Orleans Times-Picayune*, Oct. 11, 2007, at 1 ("Three children, 7, 8 and 13, were struck by stray bullets" at birthday party for five-year-old twins.).

– Walt Philbin, "Man Carrying Baby Hit by Stray Bullets in Drive-By," *New Orleans Times-Picayune*, July 14, 2007, at 1.

10

district judge did not make any finding as to where the majority of firearms trafficking offenses occur, and he assumed that the firearms trafficking offenses which make up the Guidelines' "national average" are spread evenly throughout the country rather than clumped in certain areas. But if the article cited by the district court is correct that the black market for guns is only profitable in a few areas like New York, Washington, D.C. and Boston, then it may well be that firearms trafficking crimes occur almost entirely or predominantly in those areas, in which case the Guidelines may already account for any deterrence issues raised by New York's strict gun laws. If so, defendant-appellant's sentence would have been needlessly increased.

The majority states that firearms trafficking is more profitable in areas with strict gun laws because more regulation increases the costs of obtaining a gun. And "[w]here the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence." Maj. Op. at 24.[7] The majority commits a fundamental error by attempting to bolster the sentencing judge's argument by relying upon articles and economic theories never referenced by the district court. This shifts the appellate court's role from

_____

[7] The majority oversimplifies the economic incentives faced by firearms traffickers. In discussing deterrence, the majority focuses only on the severity of the penalty. But the expected cost of firearms trafficking is a function of both the sanction's magnitude and the probability of getting caught. *See* Richard A. Posner, Economic Analysis of the Law, § 7.2 (7th ed. 2007) ("An expected punishment cost of $1,000 can be imposed by combining a fine of $1,000 with a probability of apprehension and conviction of 1. . . ."). In areas with strict local gun laws, firearms traffickers may face a greater risk of apprehension than in more lax regimes. The majority seems to acknowledge this point when it later asserts that "stringent local gun regulations create a higher barrier to entry" for firearms traffickers. Maj. Op. at 24 n.14; *see* Concurring Op. of J. Raggi at 22 (noting New York City's "decade-long commitment of increased police resources to removing illegal guns from the street"). Accordingly, even without increasing the sanctions on gun trafficking, the expected cost for this offense may be sufficiently elevated in more tightly regulated markets so as to achieve the same amount of deterrence present in more lax regimes. Regardless, the speculative nature of these arguments only emphasizes the need for data, an ounce of which would be worth a ton of theory.

11

reviewing the lower court's sentencing rationale to crafting it. Even assuming that the majority's general deterrence rationale were correct, defendant-appellant's case is a particularly poor application. Defendant-appellant sold his guns in Florida, and nothing in the record indicates that he profited more on his sales to New York than on his sales to other destinations.

There are additional reasons to be skeptical and wary of the district court's theory of general deterrence. First, it is unrealistic to believe that gun traffickers willing to risk up to twenty-five years under New York law (N.Y. Penal Law §§ 70.02, 265.13 (McKinney 2008)) will now be more deterred by the possibility that, if they are charged in federal court, a federal sentencing judge in New York may increase their sentence based on the gun destination. Second, determinations regarding general deterrence may be highly subjective, and we must be careful that the individual defendant is not lost in a stereotype. If we accept the unsubstantiated general deterrence theory here, then we open the door to sentencing increases or decreases based on a litany of socio-economic factors that some study shows are linked with an increased or decreased likelihood of committing a particular crime. Finally, deterrence assumes that potential violators can anticipate what punishment they might receive. To the extent that consequences for the same federal offense vary widely from one judge to the next, deterrence is undermined because "a defendant who comes up for sentencing has no way of knowing or reliably predicting whether he will walk out of the courtroom on probation, or be locked up for a term of years that may consume the rest of his life, or something in between." Marvin E. Frankel, *Criminal Sentences: Law Without Order* 6 (1973); *see* U.S. Sentencing Guidelines Manual Ch. 1 Part A.1.3 ("A sentencing system tailored to fit every conceivable wrinkle of each case would quickly become unworkable and seriously compromise the certainty of punishment and its deterrent effect.").

12

Even if I were to find adequate the district court's deterrence-based rationale for varying from the Guidelines, I still would not affirm the district court's judgment. The majority held that it need not consider the district court's argument that firearms create a greater risk of harm in more densely populated areas because the sentencing judge's deterrence rationale provided "an independently sufficient justification for its variation from the Guidelines." Maj. Op. at 23. But nothing in the record demonstrates that the district court would have increased the sentence to the same extent based solely on the deterrence rationale. We should not encourage district courts to compile catalogs of possible justifications for their sentences in the hope that appellate courts will sift the wheat from the chaff in pursuit of a valid reason to affirm.

I believe that district courts should be extremely careful, if not reticent, about imposing generic policy preferences on individual defendants. I do not, however, exclude the possibility that there may exist local conditions that may warrant a variance from the Guidelines if the conditions are significant and have not already been factored into the Guidelines. Our criminal justice system benefits when district courts and the Sentencing Commission engage in an "iterative process" whose outcome minimizes unwarranted sentencing disparities while appreciating individual nuances. *See* Tr. of Oral Arg. at 39, *Gall v. United States*, 128 S. Ct. 586 (No. 06-7949) (Breyer, J.) ("What we want . . . is to interpret that word 'reasonable' so that we get back to a situation where judges do depart when they have something unusual and maybe occasionally when they think the guideline wasn't considered properly, and then the iterative process takes over, going back to the commission. Now, how do we get there?"). But the majority's approach risks casting aside the Guidelines instead of enhancing their value.

Appellate courts must not abdicate their responsibility to ensure that sentences are based

13

on sound judgment, lest we return to the "shameful" lack of parity, S. Rep. No. 98-225, at 65 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3248, which the Guidelines sought to remedy. Gut feelings about regional differences can be subjective in dangerous ways. Empirical data should be scrutinized because they make subjective feelings appear plausible, even when the analysis suffers from significant flaws. We should therefore have vacated the sentence and remanded this case to the district court for reconsideration.

POOLER, Circuit Judge, dissenting:

I join in the majority's conclusions in Parts I and II(A) regarding our authority to review sentencing decisions as well as in Judge Straub's and Sotomayor's dissents insofar as they address the economic deterrence basis for the sentence imposed below. I also agree with Judge Sotomayor's analysis of the closer standard of review that should be applied in this case. Because the majority does not rest its decision on the district's court's determination that a gun running offense is more serious when guns are transported to New York City, I take no position on that issue.